## F. W. MARTIN & CO. v. COBB.
### No. 11578.

Circuit Court of Appeals, Eighth Circuit.
March 5, 1940.

160

R. L. Arnold, of Texarkana, Ark. (Atchley & Vance, of Texarkana, Tex., and Arnold & Arnold, of Texarkana, Ark., on the brief), for appellant.

Ben Shaver, of Texarkana, Ark. (James D. Shaver and James H. Williams, both of Texarkana, Ark., Jeptha A. Evans and Charles I. Evans, both of Booneville, Ark., Shaver, Shaver & Williams, of Texarkana, Ark., and Evans & Evans, of Booneville, Ark., on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and NORDBYE, District Judge.

WOODROUGH, Circuit Judge.

In this suit against an employer for damages for personal injuries resulting in the death of its employee, the jury assessed damages in favor of the widow as administratrix in the sum of fifteen thousand dollars, and this appeal is taken by the employer from the judgment rendered against it on the verdict.

It was alleged in the plaintiff's complaint that at the time of the accident the defendant was engaged in drilling a well in the oil field in Miller County, Arkansas, by means of a derrick, machinery and appliances, and that the intestate, her husband Earl Cobb, was employed on the work as a common laborer. In the course of the operations while the decedent was standing on a deck of the derrick about thirty or forty feet above the floor thereof in the proper discharge of his duties, and while he was in the exercise of due care, being securely fastened to the derrick by means of a safety belt supplied him by the employer for that purpose, the derrick fell, inflicting fatal injuries upon him. Plaintiff alleged that the fall of the derrick and the resultant injuries were caused by defendant's negligence, "the particular act or acts of negligence on the part of defendant causing such injury to and death of the plaintiff's intestate being to her unknown but known to the defendant". The defendant denied any negligence on its part and alleged that the decedent's knowledge of the derrick machinery and appliances was equal to its own and that he had assumed the risks of his employment. It alleged that the falling of the derrick could not have been foreseen or anticipated by defendant and that it was an unavoidable accident.

It appears from the evidence that plaintiff's intestate was in defendant's employ as a driller's helper working on the derrick operated by defendant and that the falling of the derrick caused the injuries from

which he died some thirteen hours later. The derrick was a Muskogee Iron Works steel derrick, 122 feet in height from the derrick floor, having a capacity of 537,000 pounds or 268 tons. The model was technically called M. I. W. 537 and was of approved standard construction, having been in general use in the oil field for approximately three years. The particular derrick had been successfully used in drilling at least two wells before its erection at the place where the accident in question occurred. The erection there was completed on July 15, 1938, and the derrick fell August 4, 1938.

The substructure of the derrick was of steel, approximately eight feet in height and rested on heavy wooden sills, the corners being made of 3x12 pine boards cross-laid with some 8x10 sills and some 12x12 sills. The derrick itself was also made entirely of steel and had four legs of steel angle irons ⅝x5 inches put together in fourteen foot sections, the space between the legs being twenty-four feet at the derrick floor and five feet six inches at the top of the derrick. Crossbars of straight ¼x4 inch angle irons were set between the derrick legs at seven foot intervals and the fourteen foot leg sections were held in place by four inch pieces of angle iron eight inches long, bolted on each side of the legs with ¾ inch bolts with lock washers, four bolts in the end of each opposing derrick leg. The land on which the derrick was built was level, no excavating having been necessary, and when completed the derrick was level and plumb and in good condition.

The V door of the derrick, which is a space left in one side in the shape of an inverted V through which pipe and drill stem may be pulled in, faced toward the north. The rotary table, through which the power was applied to turn the drill stem when drilling, was in the center of the derrick and some eighty feet above the floor. At the top of the derrick there was a roller or pulley called the crown block, and steel cables ran through and over the crown block down through another pulley suspended inside the derrick called the travelling block; the cable after passing through the travelling block went back over the crown block and down to the drum to which the steam engine which operates the travelling block was attached. The travelling block and the crown block constituted a block and tackle arrangement by means of which the drill stem was pulled out of the hole and the casing was let into the hole.

At the time of the accident there was a pipe rack on the south side of the derrick floor, and some eighty feet above the floor along the west side there was a finger board in which a series of slots were cut to hold sections of drill stem pipe. The defendant's custom when the drill stem pipe was not in use was to stand it in ninety foot lengths inside the derrick, the bottoms resting in the pipe rack on the derrick floor and the tops leaning in the slots in the finger board some eighty feet above the derrick floor. The stack of drill pipe would slant slightly and lean against the derrick side, but according to defendant's evidence it exerted very little pressure against that side due to its almost perpendicular position. The derrick was not equipped with pipe rack or finger board for stacking the drill stem pipe inside at the time it was built at the location.

The defendant carried on the drilling operation continuously through three shifts with eight men in crews working eight hours each. The work was under the direction of a supervisor, referred to as a "tool pusher", who might have several wells under his supervision, and a "driller" was in charge at each well, a Mr. Knight being the "driller" who directed the decedent in his work. The accident happened after the drilling had progressed to about 6,200 feet following five days of drilling.

The drilling shift of which decedent was a member came on at seven o'clock in the morning of the accident, and the preceding shift during the night before had pulled some 6,200 feet of drill stem pipe out of the hole, using for this purpose the steam engine, the drum and the block and tackle arrangement. The entire weight of the 6,200 feet of drill stem pipe had been put on the derrick in this operation of pulling the drill stem pipe out of the hole. As it was pulled it was separated into ninety foot sections or thribles, and was stacked inside the derrick in the pipe rack and finger board, there being about seventy sections of thribles in all. Its weight, together with the tool joints, was about fifty or sixty tons.

At the time the derrick fell the operation in progress was setting casing into the hole which had been drilled by use of the drill stem pipe and approximately 4,800 feet of casing had been set. The hole being full of mud and water, the method was to

plug the lower end of the first section of the casing that was set by means of a ball valve that would exclude the mud and water from the casing, and then pump mud inside the casing in order to make the string of casing heavy enough to sink itself into the hole. The casing was in thirty foot sections, being lowered one section at a time, and as the joints were added mud was pumped inside the casing every twenty or twenty-five joints. The joints of casing were screwed on to each other, and while they were being screwed on the weight of the string of casing was supported by the rotary table, being held by slips with gripping teeth and not by the cables, block and tackle, or derrick. When a joint had been made secure by screwing it on, the driller would pick up the whole string of casing with the engine, putting the weight on the cables and derrick, the slips in the rotary table would be released and the whole string of casing would be let down into the hole with the cables and pulleys for an additional distance of thirty feet when the slips would again be brought into operation and the process repeated.

At the time the derrick started to fall, the weight of the string of 4,860 feet of casing was on the cables and derrick, and the string of casing was being let into the hole into which it was sinking by its own weight, the sinking being controlled by the driller through the brake on the drum around which the cable was wound. It was being run smoothly without jerks or jars, and in the usual and customary manner. As the casing was filled with mud its weight in the mud and water filled hole was the same as it would be empty on the ground, and was figured with the couplings at about thirty five tons, approximately twenty tons less than the weight of the drill stem pipe previously pulled out of the hole and then stacked in the derrick.

It appears that the northwest corner of the derrick gave way and the derrick fell in the direction toward which the drill stem pipe was stacked and slanted, with very little previous warning given. The stacked drill stem pipe was heard to rattle, but whether before the falling started or afterwards is not clear. The decedent was then working on the "stabbing board" laid across the frame of the derrick some thirty two feet above the floor, his duty being to help guide the thirty foot pipe sections at the top and while they were being screwed on to the string of pipe being lowered into the well. There was a safety rope stretched across the derrick and fastened at each end to the metal parts, and his safety belt held him fast to the rope so that if he should be jarred from the stabbing board in the course of his work he could not fall to the floor but would be held suspended in the air. Apparently the falling of some of the drill stem pipe or the casing caused the crushing of his body and the fatal injuries when the derrick fell. An inspection of the derrick very shortly after it fell disclosed no old breaks in any of the metal parts, and it was fairly to be inferred that it was the giving way of the corner at the bottom which occasioned the collapse. There was some evidence that water and mud was seen at that place.

As the operations were being carried on smoothly, without jerks or jolts, the loads to which the derrick was being subjected aggregated only a fraction of its 268 ton capacity. The rig builder who constructed the derrick was familiar with the type of derrick and the particular derrick, and testified that "it would carry the load [which was then upon it][1] if it [the derrick][1] was like it was when we first built it."

At the conclusion of the evidence the defendant moved for directed verdict on the grounds (1) that the doctrine of res ipsa loquitur had no application in this case as it was brought against the master for injuries to the servant, (2) that the plaintiff had not sustained the burden of proof on her part, (3) that there was no proof of negligence proximately causing the injuries and the uncontradicted proof showed that defendant was free from negligence and that the collapse of the derrick resulted from unavoidable accident.

The motion was overruled and the court instructed the jury: "If you find from a preponderance of the evidence that plaintiff's intestate, Earl Cobb, was in the employment of the defendant as a common laborer, that he was working on the stabbing board some 30 to 32 feet above the floor of the derrick where it was his duty to be, that he was in the exercise of due care for his own safety, that the derrick and machinery were under the control or management of defendant, that the derrick fell causing injuries to the said Earl Cobb from which he died, that in the ordinary course of things the derrick would not have

---

[1] Supplied.

fallen if those who had its control or management had used proper care, the happening of the injury under such circumstances make out a prima facie case for the plaintiff and entitles her to a verdict at your hands, unless the evidence shows that the falling of the derrick was not caused through any lack of care on its part." Exception to the instruction was allowed, and on this appeal the denial of the motion for directed verdict and the instruction based on the doctrine of res ipsa loquitur are assailed as erroneous.

■ The law of Arkansas controls decision of the case (Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487) and the questions for our determination on the appeal are:

(1) Whether the doctrine of res ipsa loquitur is applicable under the Arkansas decisions, and (2) if so, whether the facts justified the court in applying the doctrine in the instructions to the jury; (3) whether there was evidence sufficient to sustain the verdict.

(1) It is recognized at the outset that prior to the decision of the Supreme Court in Erie v. Tompkins, supra, the federal courts in this and other circuits had followed the declaration of the Supreme Court in Patton v. Texas & Pacific, 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361, and had refused to apply the doctrine of res ipsa loquitur in cases brought on behalf of servants claiming to have suffered injury through the negligence of their masters. This court in passing on such a case said: "It is settled law that, as between a master and his servant, the maxim 'res ipsa loquitur' has no application". Shandrew v. C. St. P. M. & O. Ry. Co., 8 Cir., 142 F. 320, 323; Latting v. Owasso Mfg. Co., 8 Cir., 148 F. 369; Cryder v. Chicago, R. I. & P. Ry. Co., 8 Cir., 152 F. 417; Midland Valley Ry. Co. v. Fulgham, 8 Cir., 181 F. 91, L.R.A.1917E, 1; Phillips Petroleum Co. v. Manning, 8 Cir., 81 F.2d 849.

■ But the decisions of the Supreme Court of Arkansas disclose that that court has upheld and applied the doctrine of res ipsa loquitur in many cases passed upon by the court, and has held directly that it is not the nature of the relationship between the parties but that it is the nature and character of the act causing the injury which determines the cases in which the doctrine is applicable. Arkansas Light & Power Co. v. Jackson, 1924, 166 Ark. 633, 267 S.W. 359, 360, was a suit to recover damages for negligence of the master causing the death of its servant. The court said:

"In the case of Chiles v. Ft. Smith Commission Co., 139 Ark. 489, 216 S.W. 11, 8 A.L.R. 493, we quoted there cases holding that, while the doctrine of res ipsa loquitur, had ordinarily been applied in suits against carriers, there was no sound reason for limiting it to such cases, and that the presumption expressed by that maxim originates from the nature of the act causing the injury, and not from the nature of the relation between the parties, and that the presumption arises from the inherent nature and character of the act causing the injury. We there quoted with approval from section 156 of the chapter on 'Negligence' in 20 R.C.L., the following statement of the law:

"'More precisely, the doctrine res ipsa loquitur asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery, in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. * * * The presumption of negligence herein considered is, of course, a rebuttable presumption. It imports merely that the plaintiff has made out a prima facie case which entitles him to a favorable finding, unless the defendant introduces evidence to meet and offset its effect. And, of course, where all the facts attending the injury are disclosed by the evidence, and nothing is left to inference, no presumption can be indulged; the doctrine res ipsa loquitur has no application.'

"See, also, C. O. & G. R. Co. v. Doughty, 77 Ark. 1, 91 S.W. 768, which was a suit by the servant against the master."

In the later case of Pekin Wood Products Co. v. Burkhardt, 192 Ark. 1025, 96 S.W.2d 776, the suit for damages for personal injuries from negligence was brought by a servant against his master. The Supreme Court of Arkansas again quoted the statement of the doctrine of res ipsa loquitur made in its opinion in Chiles v. Fort Smith Commission Co., 139 Ark. 489, 216 S.W. 11, 8 A.L.R. 493. It cited Arkansas Light & Power Co. v. Jackson, supra, with approval, and indicated clearly its adher-

ence to the determination that the doctrine is applicable as between master and servant in appropriate cases. Recovery was denied in the case, not because it was a master and servant case, but because the testimony "suggests several probable causes of the injuries, for none of which would appellant (the master) be liable". These decisions stand unmodified and establish that the doctrine of res ipsa loquitur is applicable to master and servant cases in Arkansas where the facts and circumstances are appropriate for its application.

■■■ .(2) We think the facts justified its application here. The criterion laid down by the Supreme Court of the state was satisfied by the plaintiff's showing that the derrick which collapsed and fell with the decedent was entirely under the control and management of the defendant, and that the occurrence of the fall was such as in the ordinary course of events does not happen if due care has been exercised. It is apparent that this derrick structure with its heavy machinery and appliances designed and constructed to manipulate such great weights of drills, pipes and tools, was the product of engineering studies and skills entirely beyond the field of the decedent's labors. The maintenance of the plant and the operation of the machinery and handling of the ponderous pipes were all matters outside his ken. In the performance of his tasks, he had only to fasten himself securely with the safety belt and, standing upon his elevated plank, to work with his hands at the ends of the pipes, being entirely dependent upon defendant for security of the structure where he was called to work.

The evidence as to the loads that were put upon the derrick when it fell, and that the structure had been in good condition and was adequate and would not have fallen under such loads at the time it was completed, necessitated the inference that the condition had changed during the days and nights of drilling operations. The duty to inspect and maintain a reasonably safe place to work was upon the defendant, and if it had been performed there would have been no falling of the derrick. Such structures do not fall under the ordinary uses for which they are designed and to which they are adapted, and the proof is clear that this one would not have done so if it had been properly maintained. The instruction which permitted but did not require the jury to infer negligence on the part of the defendant was proper. Illustrations of the circumstances under which the doctrine has been applied may be found in the cases where the unexplained falling of a crane caused injury, Central R. Co. v. Peluso, 2 Cir., 286 F. 661; where there has been an escape of electrical currents generated by and controllable by the defendant, resulting in injury without fault of the injured, Futrell v. Arkansas-Missouri Power Corp., Ark., 8 Cir., 104 F.2d 752; where a building has fallen, injuring innocent occupants, Chiles v. Ft. Smith Commission Co., 139 Ark. 489, 216 S.W. 11, 8 A.L.R. 493; where scaffoldings have collapsed, American Shipbuilding Co. v. Lorenski, 6 Cir., 204 F. 39; where timbers which were constituent parts of a building have fallen, Lipsky v. C. Reiss Coal Co., 136 Wis. 307, 310, 117 N.W. 803, 39 C.J. 980n; where objects have fallen from buildings, Poth v. Dexter Horton Estate, 140 Wash. 272, 248 P. 374; 20 R.C.L. 191, Sec. 158; Lucid v. E. I. Du Pont DeN. Powder Co., 9 Cir., 199 F. 377, L.R.A.1917E, 182; Stanolind Oil & Gas Co. v. Bunce, 51 Wyo. 1, 62 P.2d 1297; and in certain railroad accident cases, Lowery v. Hocking Valley Ry. Co., 6 Cir., 60 F.2d 78. Cf. Missouri Pacific R. Co. v. Baum, 196 Ark. 237, 117 S.W.2d 31, 34.

Many Arkansas federal and other negligence cases are cited in which the courts held that the doctrine was not applicable upon the particular issues and facts presented. The appellant relies particularly on the decision of this court in Phillips Petroleum Company v. Manning, 81 F.2d 849, 852. In that case the judgment which was attacked in this court was not based in any respect upon the doctrine of res ipsa loquitur. The plaintiff employee had alleged specific acts of negligence on the part of the employer proximately causing the injuries for which the judgment was recovered, and the attack made against the judgment in this court was on the ground that there was no evidence to sustain the allegations. We found there was none and therefore reversed the judgment. The decision was prior to Erie v. Tompkins, supra, and our general statement that "in an action of this character, the rule res ipsa loquitur cannot be invoked", was fully supported by the federal cases cited. The case of Kansas City Southern Ry. Co. v. Cook, 100 Ark. 467, 140 S.W. 579, 581, which we cited from Arkansas, supported the text only as to an action and judgment based on specific acts of negligence. The

Arkansas court had before it a case in which the plaintiff railroad employee had recovered for an injury suffered by him upon a train which he was helping to operate. He alleged that the train was equipped with defective appliances which caused his injury. The trial court had instructed the jury that "if the plaintiff's injuries were caused by a moving train this constituted prima facie proof of negligence on the part of the company". In considering the instruction, the Supreme Court recalled that it had repeatedly held "in construing the statutes of this state * * * that a prima facie case of negligence is made against a railroad company by proof of injury caused by the running of a train. But this rule has never been applied in favor of an employé who was injured while engaged in the operation of the train which caused the injury. To give the rule such an application would make it possible for an employé, responsible for the running of the train, to create, by his own negligent act, a situation which would raise in his own favor a presumption of negligence against his employer. The rule does apply, however, in favor of employés who are not engaged in the operation of the train. St. L., I. M. & St. Ry. Co. v. Standifer, 81 Ark. 275, 99 S.W. 81; St. L. S. W. Ry. Co. v. Graham, 83 Ark. 61, 102 S.W. 700, 119 Am.St.Rep. 112; St. L. I. M. & S. Ry. Co. v. Puckett, 88 Ark. [204], 207, 114 S.W. 224; Little Rock & Ft. Smith Ry. Co. v. Blewitt, 65 Ark. 235, 45 S.W. 548.

"This court has steadily adhered to the rule announced many years ago that, in cases of this character, there is no presumption of negligence on the part of the master, and that it devolves upon the injured servant to show, not only that the appliances furnished were defective, but that the master had notice of the defect." Citing cases.

The court observed that "in the present case there was a conflict in the testimony as to whether there was any defect which caused the plaintiff's injury" and the instruction was therefore held to be incorrect because "the statute only raises a presumption of negligence after it is shown that the injury was caused by a defect in the appliance, etc."

Neither our decision in the Phillips case nor the above decision by the Arkansas court justify refusal of this court to apply in this case the Arkansas court's determination that the doctrine of res ipsa loquitur must be applied in appropriate circumstances, notwithstanding the relationship of master and servant existed between the parties at the time of the injury. The jury was therefore justified in inferring from the facts shown in this case that the derrick was defective through defendant's negligence.

■ (3) Under Arkansas law governing cases of this character between master and servant, it was also necessary to plaintiff's recovery that it should appear upon consideration of all the evidence in the case and by a fair preponderance of all the evidence applying the doctrine of res ipsa loquitur, that the defendant had notice of the defect in time to repair or was negligently ignorant of it and the jury was so instructed in this case.

On the trial of the case the defendant offered as its only witness the driller who had direction of the shift in which decedent was working. From this witness the defendant elicited testimony that the witness was thoroughly familiar with the derrick and drilling outfit; that the derrick model was of standard construction in general use, and that the particular derrick had been successfully used on other wells; that the operation at the time of the accident was proceeding smoothly, with no hangs, jerks or jars, and in answer to the question, "Did you then, or do you now, know of any defect in that derrick or any of the equipment or machinery that you had there?" the witness answered, "No, Sir". Manifestly the purpose of the testimony on the part of the defendant company was to prove by its representative on the work that the falling of the derrick was merely an unavoidable accident, as pleaded in the answer, and that the company had no notice of any defect in the derrick. But after laying proper foundation, the plaintiff called impeaching witnesses who testified that the driller was present at the funeral of the deceased and that he there stated in their hearing, in reference to the situation and the work at the time of the collapse of the derrick, "that one corner of the derrick had given down, but he thought it would be all right to go ahead and put the casing in."

■ The impeaching testimony was not competent as an admission made by the company or as affirmative proof that the derrick had given way to the com-

pany's knowledge. The declaration was not part of the res gestae. It was competent to impeach the only witness offered by the company to sustain the defenses pleaded. That witness to the company's lack of notice of defect having been impeached, there was on the part of the company which had control of the instrumentalities and had caused the deceased to attach himself to the derrick with the safety belt, no explanation or accounting for the falling of the derrick, and there was no evidence offered that it had inspected the structure, machinery or appliances at any time after operations began, or that it had exercised any care or precaution to maintain a safe place to work for the plaintiff's intestate. The case was, therefore, properly submitted to the jury after the prima facie case was made out by the plaintiff upon application of the doctrine of res ipsa loquitur to plaintiff's evidence, to determine whether the plaintiff had in the light of all the evidence and upon application of the same doctrine to all the evidence, established by a preponderance thereof, first, that the derrick was negligently defective, and, second, that the defendant either knew of such defect, or in the exercise of reasonable care should have known of it, in time to repair the same.

The verdict in favor of the plaintiff finds support in substantial evidence and the judgment is affirmed.