Silas REDDING, Jr., and Georgia J. Redding, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1535.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Aug. 8, 1961.

Gean, Gean & Gean, Fort Smith, Ark., for plaintiffs.

Charles W. Atkinson, U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

### Pleadings

· On May 13, 1960, the plaintiffs filed their complaint against the defendant in which the plaintiff, Georgia J. Redding, seeks judgment against the defendant in the sum of $340,000 and the plaintiff, Silas Redding, Jr., seeks judgment against the defendant in the sum of $170,000. The suit was commenced under the Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b) and 2674.

Jurisdiction is granted by 28 U.S.C. § 1346 (1960 Supp.).

This opinion, containing the findings of fact and conclusions of law, is filed in lieu of formal findings of fact and conclusions of law, separately stated. Rule 52(a), Fed.R.Civ.P., 28 U.S.C.

The plaintiffs, husband and wife, are citizens of the State of Arkansas, but on dates material herein were residing in Lawton, Oklahoma.

On and prior to November 3, 1959, the plaintiff, Silas Redding, Jr., was serving as enlisted personnel with the rank of Sergeant in the United States Army stationed at Fort Sill, Oklahoma. His wife, the plaintiff Georgia J. Redding, was and is a dependent and entitled to receive medical care in the medical facilities of the United States Army.

In numbered paragraphs V and VI of the complaint the plaintiffs alleged:

#### "V.

"That on or about November 3, 1959, the plaintiff Georgia J. Redding was admitted to the United States Army Hospital at Fort Sill, Oklahoma, for the purpose of a vaginal hysterectomy, the same being scheduled for November 4, 1959, and, on the morning of November 4, 1959, she was taken to surgery at said hospital and a vaginal hysterectomy, anterior and posterior repair was performed and during the course of the operation she was transfused 1,000 cc's of B-positive blood by the physicians and attendants, who were officers, or employees of the United States of America, and were acting in the scope of their office, or employment, and they impliedly agreed to exercise and use a reasonable degree in the care and treatment of the plaintiff Georgia J. Redding.

"VI.

"That the plaintiff Georgia J. Redding had blood type O-positive at the time of said operation and this condition should have been discovered and known by said officers and employees prior to the administering of the B-positive blood, as above outlined, which blood was administered in the operating room while the plaintiff Georgia J. Redding was under anaesthesia, and such act of administering the incorrect type of blood was an act of negligence and carelessness."

In paragraph numbered VII the plaintiffs alleged:

"VII.

"That as a proximate result of the negligent and careless act of administering the B-positive blood to the plaintiff Georgia J. Redding, instead of the O-positive, the plaintiff Georgia J. Redding has suffered * * * [It does not seem necessary to set forth a detailed description of the injuries allegedly suffered by the plaintiff, Mrs. Redding.] * * * which said careless and negligent act and such conditions created, or caused thereby, have caused the plaintiff Georgia J. Redding to suffer permanent damage and injury to her body, for all of which she should be compensated in the sum of $340,000; and, as a proximate result of said carelessness and negligence, the plaintiff Silas Redding, Jr., has been caused to suffer mental anguish and will be caused to suffer mental anguish in the future; has been caused to expend sums of money for the care and maintenance of his wife, and will be caused to expend sums of money for the care and maintenance of his wife in the future * * * has been caused to expend sums of money for the care of his and his wife's children, whose ages are 14, 5, 4, 3 and 1 years, which care would have been given by the mother of said children, the plaintiff Georgia J. Redding had she not been injured by said careless and negligent acts; and has caused him to lose the companionship, society and consortium of his wife, for which he should be compensated in the sum of $170,000."

On July 18, 1960, the defendant filed its answer in which the defendant admitted that the cause of action arises under the Federal Tort Claims Act and that jurisdiction is granted by Title 28, U.S.C. § 1346(b), as amended.

Further answering, the defendant, in numbered paragraph 4 of its answer, stated:

"It admits that Georgia J. Redding was admitted to the U. S. Army Hospital at Fort Sill, Oklahoma, for the purpose of a vaginal hysterectomy as alleged in Paragraph 5, and that during the course of the operation she was transfused 1,000 cc of 'Group B, Rh positive' blood by the surgeon, who was an officer of the Medical Corps, United States Army, but it denies all other allegations of said Paragraph 5."

The defendant also admitted that plaintiff, Siles Redding at all times material was a Sergeant in the United States Army, and that his wife, plaintiff Georgia J. Redding, was a dependent and entitled to receive medical care at the medical facilities of the United States Army, but denied the other allegations in the complaint.

The case was tried to the court on June 26 and 27, 1961. At the conclusion of the trial, the court requested the parties to submit memorandum briefs in support of their respective contentions together with a summary of the facts which they contend are established by the testimony. The briefs and summary of facts have been received and considered, along with the pleadings, all the testimony and the exhibits. The case is now ready for final disposition.

Facts

There is very little dispute, if any, in the facts as to what occurred prior

to and at the time of the operation. There is some disagreement as to the extent of the injuries that resulted from the transfusion of B-positive blood instead of O-positive blood and the damages sustained by the plaintiffs.

On November 3, 1959, the plaintiff, Sergeant Redding, had been stationed at Fort Sill, near Lawton, Oklahoma, for several months.

On March 12, 1959, the plaintiff, Georgia J. Redding, was pregnant and was receiving prenatal treatment and care from Captain Gerald M. Platock, a member of the Medical Corps of the United States Army, stationed at Fort Sill and assigned to the Station Hospital, Obstetrics and Gynecology Department. Prior to that pregnancy, Mrs. Redding had given birth to six children and had had two miscarriages. During this treatment and care, Captain Platock, on March 11, 1959, caused her blood to be typed, and the report filed March 12, 1959, showed her blood to be Group O, Rh-positive.

In June 1959 the baby was born without any complications. Following her recovery from the birth of the child, Captain Platock scheduled a vaginal hysterectomy for November 4, 1959. In his narrative summary attached to his deposition, he stated:

"Post-partum check revealed a marked cysto-rectocele and a uterine prolapse. Vaginal hysterectomy was contemplated and scheduled for the 4th of November 59. She has been having trouble with stress, urge incontinence and a heaviness in the pelvis over the past six years which gradually seemed to become worse. When admitted to the hospital on November 3 she was seen and examined. Blood pressure was 132/80 pulse 72 temperature 98 weight 122½.

"Physical examination revealed a well-developed well-nourished white female whose only positive findings other than the Gyn findings previously noted was a grade 2 systolic murmur at the apex. She had a

regular sinus rhythm and PMI was at the mid-clavicular line. The murmur did not radiate and she had no history of shortness of breath, palpitation, rheumatic fever or any other cardiac difficulties. Past history was essentially negative except that she had an appendectomy at the age 14. She was taken to surgery on the morning of November 4 where a vaginal hysterectomy, anterior and posterior repair was performed. She had average blood loss and was transfused 1000 cc's of B-positive blood."

When she was admitted to the hospital on November 3, Captain Platock requested that her blood be typed and three bottles, each containing 500 cc's of blood, be ready for use during the operation the next morning, November 4, 1959. Private Robert Chagnot drew the required amount of blood from the patient, Mrs. Redding, and it was typed and cross-matched by Sp-4 Emmitt E. Brown on the same date, November 3, 1959. At that time the Chief of the Laboratory Service, Captain Rex. D. Couch, was not present. The bottles containing the blood which were transferred from the laboratory to the operating room were each labeled showing the contents to be type B-positive. During the operation Captain Platock and his assistant transfused 1000 cc's from bottles Nos. 241 and 281.

Captain Platock in his summary further stated:

"Her condition at the closing of the operation was satisfactory. Her blood pressure and pulse remained stable throughout the entire procedure and there seemed to be no cause for alarm regarding her condition. The urine at the closing of the procedure was checked from the Foley catheter and found to be clear. At 5 PM on the day of surgery it was noted that the urinary output was extremely minimal and amounting to approximately 50 cc's and this being very dark in color. The Foley was irrigated but normal output was

still not obtained so the Foley was removed and another catheter was reinserted. Her blood pressure and her pulse was still stable. At 1 AM on the morning of 5 November the blood pressure dropped to 90/70, the pulse was 128 and respiration 16. The patient appeared jaundiced and a negligible amount of urine was obtained since previously being checked about 5 PM on the 4 of November. It seemed quite obvious at this time that the patient had had a transfusion reaction and the urine was sent to the laboratory for bilirubin analysis. She was retyped and crossed and it was found that the patient typed O-positive.

"Previously when she was admitted to the hospital she was typed as B-positive as previously mentioned. She was given 1000 cc's of B-positive blood while in the operating room under anesthesia. Her urinary output at this time still remained negligible. Medical consultation has been sought and our plan is to evacuate the patient to Brooke for the possibility of placing her on artificial kidney. Her blood pressure has continued to drop and is now 70/50 with a pulse of 132. She is markedly jaundiced. Her condition at this time is poor.

"Prognosis is nil."

The operation had been started at approximately 9 a.m., November 4, and concluded at noon.

Captain Rex D. Couch, the Chief of the Laboratory Service, was called by Captain Platock at approximately 2 a.m., November 5, when her condition became alarming.

In the report to his Commanding Officer, dated November 10, 1959, Captain Couch, after stating that Sp-4 Emmitt E. Brown had on Tuesday, November 3, 1959, typed and cross-matched the patient's blood as Group B, Rh-positive, and that all three bottles which had been taken from the blood bank refrigerator were determined by Sp-4 Emmitt E. Brown to be compatible with the blood of the patient, further stated:

"Almost immediately after this call, I received a call from Pfc John Laverty, the Laboratory CQ, who stated that he could not verify with certainty that the patient's blood was Group B, Rh positive.

"I then went to the Laboratory, where Pfc Laverty and I rechecked the blood group and Rh type of the patient. On testing the specimen a number of times we felt that the patient was either Group O, Rh positive or a very weak Group B, Rh positive. I then asked Pfc Laverty to call Sp-4 Brown to come to the Laboratory. When Brown arrived at the Laboratory, he typed the patient's blood a number of times and suspected that it was Group O, Rh positive. He then typed and back-typed (using the patient's serum with cells of known type) the blood and concluded that the patient's blood type was Group O, Rh positive, a conclusion in which I concurred.

"I then called the nurse in charge of Ward 3, and asked her to send the bottle #282 back to the laboratory. On re-crossmatching all three units of blood in question, it was found that Numbers 241 and 281 were incompatible, but that No. 282 still appeared to be compatible.

"At about 1030 hours on 5 November 1959 a request for 1000 ml of whole blood was received for Mrs. Redding. Units No. 287 and 288 (both Group O, Rh positive) were crossmatched with the patient's blood and the major crossmatch with both units was compatible."

There was no testimony that specimens from another patient were mistaken for those of Mrs. Redding.

Sp-4 Emmitt E. Brown joined the Army on November 6, 1958, and on January 3, 1959, was assigned to the Station Hospital at Fort Sill for on-the-job training, which consists of being taught the procedure of any particular job in

the Army under the guidance or supervision of a more experienced and qualified person. He had been receiving on-the-job training under Captain Rex D. Couch for approximately eleven months prior to November 3, 1959, when he failed to properly type and cross-match the blood of Mrs. Redding. Prior to being inducted into the Army, Brown had finished high school and had attended a junior college for a period of one year, one of his courses being a general chemistry course.

Pfc. John J. Laverty, the technician who was on duty during the night of November 4 and early morning of November 5, when Mrs. Redding became critically ill, immediately typed and cross-matched her blood using the standard procedure and found the blood to be Group O, Rh-positive.

Prior to entering the Army, Pfc. Laverty had graduated from college with a chemistry major, and in addition, before being assigned as a technician, had received training as a medic and laboratory technician in the Army School at Fort Sam Houston.

Dr. Platock, in answer to an interrogatory as to whether he was personally acquainted with the fact that Mrs. Redding was given the wrong type of blood, stated:

"She was O positive and was given B positive blood."

All of the witnesses testified that she was given Group B, Rh-positive, when her blood group was and is Group O, Rh-positive. All of the witnesses further agreed that the type or group of blood of a person does not change.

When it was definitely ascertained that Mrs. Redding had been given Group B, Rh-positive, instead of Group O, Rh-positive, Captain Platock called Dr. Jack N. Freyhof of the Brooke General Hospital at Fort Sam Houston, Texas, and received instructions from Dr. Freyhof as to the treatment of the patient until she could be transferred to Brooke General Hospital. Accordingly, the treatment recommended by Dr. Freyhof was administered, and on November 6 she was transferred by plane to the Brooke General Hospital, Fort Sam Houston, Texas. The report of Captain Platock which accompanied her to Brooke, and upon which she was admitted, states under the word "Diagnosis":

"Therapeutic misadventure, transfusion with incompatible blood with resulting renal failure. (Vaginal hysterectomy, performed this hospital 4 Nov. 59."

Under the phrase "Operations and Special Therapeutic Procedures" appears the following:

"4 Nov 1959, Panhysterectomy, vaginal.

"Anesthesia, Pentothal nitrous oxide, anectine."

It should be remembered that Pfc. Laverty and Captain Rex D. Couch typed and cross-matched blood which had been taken from the patient after she had received 1000 cc's of type B, Rh-positive, and became critically ill, which accounts for the statement in Captain Couch's report that: "We felt that the patient was either Group O, Rh-positive, or a very weak Group B, Rh-positive." He further stated, however, that when Sp-4 Brown arrived at the laboratory in response to a call, he typed the patient's blood a number of times, and after back-typing it using the patient's serum with cells of known type, it was concluded that the patient's blood type was Group O, Rh-positive. However, Pfc. Laverty, when he typed the blood before calling Captain Couch, testified that he was positive at that time that the patient had been administered Group B, Rh-positive, instead of Group O, Rh-positive.

Sp-4 Brown testified that he followed the procedures set out in Department of the Army Technical Manual TM 8–277 (Deft. Ex. 1), the pertinent sections of which were introduced and read in evidence. Witnesses, in effect, agreed that the procedures set out in the Manual above referred to are standard procedures and that the procedures in the typing of blood in civilian and army hospi-

tals are similar, with only slight changes in the technique, but the procedures followed in all first-class hospitals are fundamentally the same.

The experts were in agreement that if the recognized procedures and the procedures set forth in the Army Technical Manual had been correctly followed, they knew of nothing that could have been done which was not done and nothing which was done that should not have been done with respect to the typing and cross-matching of the patient's blood.

Col. William H. Crosby, Consultant in Hematology to the Surgeon General, on November 3, 1960, one year after the transfusion, filed with the Army a memorandum opinion based upon an investigation of the records of the two hospitals, and the reports of the laboratory technicians and physicians as to the facts relative to the erroneous transfusion and the effects thereof (Deft. Ex. 3). His testimony consisted largely of a reading of his opinion, in which he stated that the patient's blood type was erroneously found to be Group B, Rh-positive, and that there is no doubt that Mrs. Redding's blood is Group O, Rh-positive. He testified, however, that a mistake had been made, but sought to justify it by stating that the approved procedures were not sufficient to reveal incompatibility in all instances.

Sec. 84 of Army Technical Manual TM 8-277, (Deft. Ex. 1), is as follows:

"84. Application.

"a. The major practical application of blood grouping is in its relation to blood transfusion. Recipient and donor should belong to the same blood group. (See par. 92.) Transfusions are given to replace lost blood and to combat shock, and in the treatment of certain blood diseases, anemias, and infections.

"b. Blood grouping is an essential aid to the selection of donors for transfusion. *However, it should not be relied on solely except when the emergency is so great that cross-matching cannot also be carried out.*

*It must always be remembered that even if the donor and recipient belong to the same group, intragroup incompatibility may exist, and this cannot be detected by simple blood grouping. Errors in grouping will occur if weak or deteriorated grouping serums are used. Furthermore, the blood group designated on identification tags should be accepted only as a preliminary grouping to simplify selection of donors for regrouping and cross-matching. Only in extreme emergency should blood grouping alone be considered sufficient for selection of donors for transfusion.* (See pars. 91 and 92). [Emphasis added.]

"c. Transfusions of incompatible blood may result in dangerous or even fatal reactions. This is due to the interaction between substances in the plasma (isoagglutinogens or isohemolysins) and corresponding factors in the red cells (isoagglutinogens). This causes the cells to clump (agglutinate) or dissolve (hemolyze), or both. This danger is greatest if the red cells of the donor are agglutinated (or hemolyzed) by the plasma of the recipient. When this set of conditions is found to exist, the donor must never be used. * * *"

Section 91 is as follows:

"91. Cross-Matching

"a. General. After a donor belonging to the same blood group as the patient has been selected, the cross-matching test must be performed before the transfusion is given. This test will reveal any mistakes in blood grouping and will also usually indicate the presence of unusual agglutinins, such as Rh agglutinins which may render the donor's blood incompatible even though of the same blood group. Some Rh agglutinins are not active in saline and for this reason cross-matching should be done using cell suspensions in serum, plasma or bovine albumin rather than in saline.

Rh agglutinins act best at 37° C. and the tests should be performed at this temperature. Either the tube test or the slide test may be used but most workers feel that the tube test is preferable. * * *"

In numbered paragraph 1 of Colonel Crosby's memorandum he states:

"1. *The plaintiff's blood group.* There is no doubt that Mrs. Redding's .blood is Group O. *On 11 March 1959 during a prenatal examination, her blood group was determined and recorded (Standard Form 533, Prenatal and Pregnancy). On 2 September 1960 her blood was examined at the Walter Reed Army Institute of Research and the finding was confirmed. However, on 3 November the anti-B typing serum produced agglutination of Mrs. Redding's blood cells; the anti-A serum did not. This was interpreted by the technician to mean that the blood was Group B. Later when her serum was tested it was found to contain both anti-A and anti-B antibodies, a characteristic of Group O blood.* After the reaction occurred and it was known that she had received incompatible blood, the patient's blood was retyped. *This test was performed with the original blood used for the crossmatch on 3 November,* as well as with blood taken after the transfusion. This second test was not done by the person, Sp/4 Brown, who did the original test nor was it done in his presence, yet these second observers also recognized the presence of agglutination with the anti-B serum. Captain Couch stated, 'On testing the specimen a number of times, we felt that the patient was either Group O Rh positive or a very weak Group B Rh positive.' Reexamination of other transfusions prepared at the same time as Mrs. Redding's revealed no possibility of one patient's blood having been mistaken for another's. The evidence indicates that there was a nonspecific agglutinating reaction between Mrs. Redding's cells and the typing serum. Whether this was due to a peculiarity of the serum or a peculiarity of Mrs. Redding's red cells has not been established. * * *" (Emphasis added.)

Section 86a(1) of defendant's exhibit 1 referred to above is as follows:

"The only reagents required for blood grouping are specific and potent agglutinating serums. (See par. 95.) With satisfactory serums fairly complete agglutination should be visible to the naked eye within 15 to 20 seconds. *The activity of grouping serums should be checked at weekly intervals against known A and B cells to avoid the use of deteriorated serums that may become too weak to group all bloods properly.*" (Emphasis added.)

Section 96a of defendant's exhibit 1 is as follows:

"The simplest method is to use a commercial, absorbed B serum (anti-A), if obtainable. This agglutinates bloods of subgroups $A_1$ and $A_1B$, but not those of subgroups $A_2$ and $A_2B$. The next best procedure is to test a series of known group A and Group AB bloods with one or two weak group B serums. Usually some of the bloods are definitely more weakly agglutinated than others. These weakly reacting cells are used as $A_2$ (or $A_2B$) in the above tests."

None of the witnesses for defendant could state, with any degree of certainty, that anything other than the transfusion with the wrong type of blood caused the injury and damage to the plaintiff, Mrs. Redding.

Colonel Crosby on page 4 of this memorandum opinion (Deft. Ex. 3) states:

"It is possible that the patient, herself, may have some underlying and undiagnosed disease which altered the reactions of her blood. These tests and also the hemolytic reaction to the transfusion involve immune reactions and in all of them

the patient's blood was the common factor. There are diseases, such as disseminated lupus erythrmatosus, which are insidious and which are known to produce multiple bizarre changes in the immune system."

As heretofore shown by Sec. 84(c) of Army Technical Manual TM 8–277 (Deft. Ex. 1): "Transfusions of incompatible blood may result in dangerous or even fatal reactions." This being true, the eminent Colonel did not even intimate, much less assert, that the transfusion of incompatible blood would have any other effect than what was shown conclusively to be the effect on the plaintiff, Mrs. Redding.

A reading of the testimony of Colonel Crosby will show it was substantially a restatement of his memorandum opinion (Deft. Ex. 3), which is an argument to the effect that even though a serious mistake was made, the defendant should not be held liable.

In regard to the typing of blood in the hospital at Fort Sill, Captain Couch states that the "methods and practices used are not different from those in other parts of the country."

It is conceded that the easiest group or factor to determine in regard to human blood would be the grouping of either A, B, AB or O, and that the most readily recognized of these four groupings is type O.

Dr. Lloyd L. Barta of Fort Smith, Arkansas, a licensed and practicing pathologist, who, with his partner, Dr. A. S. Koenig, operates a pathological laboratory in Fort Smith and supervises the operation of the Southwest Blood Bank in Fort Smith, Arkansas, testified that a person with ordinary skill, using ordinary care in typing of human blood, could unmistakably determine whether the blood was one of the four groups above mentioned. The only other pathologist was Dr. Henry T. Russell of Oklahoma City, Oklahoma, who was called by the defendant, but he never disagreed with the testimony given by Dr. Barta.

From a consideration of all of the testimony the court finds that had ordinary care and skill been exercised in the typing of the blood of the plaintiff, Mrs. Redding, it would have resulted in the determination that her blood group was Group O, Rh-positive. In the typing and cross-matching of her blood during the early morning of November 5, they used the original blood used in the cross-match on November 3 as well as blood drawn from her body with which two pints, or 1,000 cc's, of B positive blood had been transfused, but notwithstanding this, Pfc. John J. Laverty readily determined that her blood was Group O, Rh-positive, and not Group B, Rh-positive.

Nature and Extent of Injuries

The plaintiff, Mrs. Redding, was 35 years, 4 months, and 14 days old on the date of the operation. In June 1959 she gave birth to a child which was her seventh. She had also suffered two miscarriages. In his summary Captain Platock, in referring to the birth in June 1959, said: "She had a normal, full term spontaneous delivery here some five months ago." The Captain further stated that she was well developed and well nourished, and the only thing noted by him was that she had been having trouble with stress, urge incontinence and a heaviness in the pelvis over the past six years, but that the only positive findings other than the Gyn findings was a grade 2 systolic murmur at the apex. However, he stated that the murmur did not radiate and she had no history of shortness of breath, palpitation, rheumatic fever or any other cardiac difficulties. A review of all of the testimony as to her physical condition on the early morning of November 4, immediately prior to the operation, is convincing that she was in what a layman would describe as good health.

The only operation that she had undergone was an appendectomy at age 14. There is no evidence of any illness from that age until the day of the operation except that she was present at Pearl

Harbor and suffered considerable shock when the Japanese bombed the American fleet. Later her husband was stationed in Germany, and she and the children joined him there. Soon after joining her husband in Germany, she became nervous and fearful because of the constant talk of a possible bombing of Germany. Her condition was such as to indicate psychiatric treatment, which was given her for a few days while she was in Germany, and it was decided that she would completely recover if she and her family were evacuated to the United States, which was done. The testimony is undisputed that when she arrived in the United States, she was hospitalized only one day, and that for a check-up, and was discharged as recovered. From that time forward she fully discharged her duties and responsibilities to her household, and did everything that an industrious and frugal wife would do in caring for her husband and children.

Captain Platock, in answer to interrogatory No. 11 in his deposition, stated: "She was examined several times during the immediate post operative period. It was noted that she had developed anemia and some degree of hypotension. She later developed jaundice and with these findings it was obvious that she had developed a hemolytic reaction probably to the blood administered while in surgery."

There is little doubt, if any, that as a result of the transfusion Mrs. Redding received a permanent injury to the kidneys and developed a condition of rheumatoid arthritis.

The concentrating ability of her kidneys is definitely impaired. Dr. Jack N. Freyhof, Assistant Chief of the Renal Section at Brooke General Hospital, conferred with Captain Platock on November 5, 1959, prior to the transfer of Mrs. Redding to Brooke, and she was under his immediate care and treatment during her entire stay in that hospital. The Chief of the Renal Section of Brooke was present during the trial but did not testify nor in anywise refute any of the testimony of Dr. Freyhof, who again

examined Mrs. Redding the day before the trial began. His basis for testifying that there was a permanent injury to the kidneys was a result of a controlled urinalysis, using the Fishberg test, and her polyuria (excess urine formation) day and night, but especially at night.

The only testimony that did not agree with that of Dr. Freyhof was that of Dr. Charles T. Chamberlain, but the tests made by Dr. Chamberlain were not under controlled conditions, and the specific gravity tests conducted by Dr. Freyhof are, in the opinion of the court, entirely reliable and accurate. These tests showed a specific gravity below normal, and therefore an impaired upper urinary tract or kidney pathology.

Dr. Thomas P. Foltz, Jr., testified that he did not make the Fishberg test, but only made the routine urinalysis.

In the report dated May 23, 1961, of Dr. Chamberlain to the United States Attorney, which was later introduced as defendant's exhibit 2, Dr. Chamberlain stated:

"We also brought to light definite x-ray evidence of arthritis at the cervical level. There is also clinical evidence on physical examination of the presence of arthritic involvement of the smaller joints, even though x-ray evidence was not present. The only possible relationship between her arthritic condition and stormy post-operative course which this patient experienced following hysterectomy in November, 1959, would be through the mechanism of lowered resistance and debility, which does seem to play a role in exacerbation of latent arthritic status."

The word "exacerbation" according to Dorland's Medical Dictionary is defined as "increase in the severity of any symptoms or disease." However, it was established by the testimony, without contradiction, that neither the plaintiff or any of her relatives had ever had any arthritis of any type prior to November 4, 1959.

Captain Platock was asked to state specifically whether he found any arthritic

condition or tendency thereto when he examined Mrs. Redding prior to the operation. He answered: "I do not recall finding any arthritic tendency."

Evidently Dr. Freyhof and others at the Brooke General Hospital did a remarkable job in saving the life of Mrs. Redding. She remained in the hospital 70 days from November 6, 1959, to January 15, 1960, but during this time she was permitted to spend a few days at home during the Christmas holidays.

For some reason not definitely explained, the hospital made a film of Mrs. Redding on certain days during her confinement in the hospital. The film was shown in open court and to a certain extent reveals the various treatments given her after her 8th day in the hospital. Plaintiffs' Exhibit 8 is a photograph taken on November 12, 1959, and graphically shows her in bed with cannulae inserted in the arteries for the operation of the artificial kidney, which was a necessary treatment. Dr. Freyhof testified that she received approximately ten treatments, each of approximately eight hours' duration. Plaintiffs' Exhibit 3 is a photograph of Mrs. Redding taken December 11, 1959, and discloses the extent of her recovery at that time. She evidently continued to improve until the date of her discharge, but certainly during the greater portion of the time, beginning immediately after the operation on November 4, until the date of her discharge on January 15, 1960, she suffered severe pain and mental anguish. Her face and other portions of her body disclose permanent scars of painful sores that developed. In fact, Dr. Freyhof said that in all cases where incompatible blood is transfused, sores develop at the entrance or opening of all mucous lined organs of the body.

The trial occured 1 year, 7 months, and 22 days subsequent to the date of the operation. It was apparent to any layman that her physical condition on the date of the trial was very questionable, however the testimony disclosed that she had undergone an operation for the removal of her gall bladder in February 1961, from which she had apparently recovered completely, and which in nowise contributed to the permanent damage to the kidneys and did not produce any arthritic condition.

Neither of the plaintiffs expended any money for hospital or medical treatment. The plaintiff, Silas Redding, Jr., no doubt did endure mental anguish because of the illness of his wife produced as a result of the blood transfusion. He likewise lost the services, companionship and consortium of his wife not only during that time but the condition exists now and will continue to exist in some degree for a considerable period of time, assuming that the permanent injuries hereinbefore discussed do not increase.

It was agreed by counsel at the trial that at the time of the trial, Mrs. Redding had a life exepctancy of 35 years, and the plaintiff, Silas Redding, Jr., had a life expectancy of 37 years.

### Discussion

The acts complained of by plaintiffs, having occurred in the State of Oklahoma, the substantive law of that State applies in determining whether the defendant is liable. 28 U.S.C. §§ 2674, 1346(b), (Supp.1960).

In Hess v. United States, 1960, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305, the court, beginning at the bottom of page 317 of 361 U.S., at page 345 of 80 S.Ct., said:

"The Federal Tort Claims Act grants the District Courts jurisdiction of civil actions against the United States 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C., § 1346(b), 28 U.S.C.A. § 1346 (b).

"Graham's death and the wrongful act or omission which allegedly caused it occurred within the State of Oregon, and liability must therefore be determined in accordance with the law of that place."

In Costley v. United States, 5 Cir., 1950, 181 F.2d 723, at page 726, the court said:

"* * * When Mrs. Costley became eligible under the provisions of these applicable army regulations for admission to this hospital to be delivered of a child, and was admitted for such purpose, she was entitled as a patient to be treated with due and reasonable care, skill, diligence, and ability; and for a failure of its employees to exercise the same, the government is liable in damages for such injuries as were suffered by the appellant, to the same extent that a private person or corporation would be under the law of the state where the wrong and injury were committed."

█ Liability for negligence or the want of ordinary care or skill is created by statute in Oklahoma.

Okl.Stat.Ann., Torts, Title 76, Sec. 5 (1951), is as follows:

"Responsibility for Negligence.— Everyone is responsible, not only for the result of his wilful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, wilfully or by want of ordinary care, brought the injury upon himself."

On September 22, 1960, soon after the answer of defendant was filed, a pretrial conference was held for the purpose of discussing and simplifying the issues. At that time the parties were not ready for trial, and the court ordered them to make all the progress possible in the preparation for trial. It was the contention of the plaintiffs that the doctrine of res ipsa loquitur would apply, and the court directed that the parties submit briefs in support of their respective contentions, not only on the issue of res ipsa loquitur but on other questions that had been discussed at the pretrial. Accordingly the briefs were furnished, and the court, after considering the briefs, advised the parties by letter dated January 12, 1961:

"It is not the duty of a court, in advance of a trial on the merits, to determine or to advise the parties that negligence will be inferred under certain conditions, but the court must wait until the facts have been developed at the trial on the merits and then it will be in a position, and not until then, to determine whether under all of the testimony actionable negligence on the part of a defendant has been proved by proof of specific acts or omissions.

"Therefore, under the facts as stated by plaintiffs, the court does not feel that it should, prior to the trial, announce any conclusion as to the effect which the court will give to such facts in determining the question of liability."

█ In this case the question of whether the doctrine of res ipsa loquitur applies is to be determined by consideration of the law of Oklahoma. 1 Moore's Federal Practice, 2d Ed., Sec. 0.315(2), p. 3513. The learned author in his discussion of the question quoted from Coca Cola Bottling Co. of Henderson, Inc. v. Munn, 4 Cir., 1938, 99 F.2d 190, to the effect that the application of the doctrine in a given case may materially affect the substantive rights of the parties, and it may be thought to involve a question, which like questions of substantive law, should be solved in the Federal District Court in a case of diverse citizenship. Following the quotation, Professor Moore states:

"* * * While this approach is no different than that adopted towards matters of substantive law, it does present difficulties."

In Mohawk Drilling Company v. Mc-Cullough Tool Company, 10 Cir., 1959,

271 F.2d 627, beginning on page 630, the court said:

"Under the Oklahoma decisions the fact that an accident happened and an injury resulted therefrom does not create a presumption of negligence, in the absence of facts and circumstances which warrant the application of the doctrine of res ipsa loquitur.

"In Canada Dry Ginger Ale v. Fisher, 201 Okl. 81, 201 P.2d 245, 246, the court said:

" 'This court has adopted the definition of the original rule of res ipsa loquitur as expressed by Thompson on Negligence, Vol. 8, sec. 7635, pgs. 1022–1224. It is quoted and approved in the case of Carter Oil Co. v. Independent Torpedo Co., 107 Okl. 209, 232 P. 419, 421, wherein many cases from other jurisdictions in harmony therewith are collected and cited. It is as follows:

" ' "Presumption—From the Happening of the Accident. Res Ipsa Loquitur. The rule of 'res ipsa loquitur' is a rule of evidence only. It takes more than the mere happening of an accident to set the rules in operation. It must be shown that the act was of such a character, as, in the light of ordinary experience, it is without explanation, except on the theory of negligence. The thing causing the accident must have been under the control of the defendant or his servant at the time of the accident. The doctrine proceeds on the theory that it is easily within the power of the defendant to show that there was no negligence on his part. The doctrine is an expression of an exception to the general principle that the negligence charged will not be presumed, but must be affirmatively shown. The presumption is rebuttable, and is overcome by a satisfactory explanation by the defendant. * * *." ' "

"In a later case, Southwest Ice & Dairy Products Co. v. Faulkenberry, 203 Okl. 279, 220 P.2d 257, 259, 17

A.L.R.2d 1373, the court stated the rule as follows:

" ' * * * * where the specific act of negligence causing the injury cannot be ascertained or shown by the plaintiff, and where the agencies out of which the negligence arises were within the exclusive control of the defendant, the plaintiff is neither required to allege nor prove any specific act of negligence. In such case, "where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care." ' "

In Sweeney v. Erving, 1913, 228 U.S. 233, at page 240, 33 S.Ct. 416, at page 418, 57 L.Ed. 815, the court said:

"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

See also F. W. Martin & Co. v. Cobb, 8 Cir., 1940, 110 F.2d 159.

In Hembree v. Von Keller, 1941, 189 Okl. 439, 119 P.2d 74, at page 77, the court said:

"Though this court has not had the opportunity to apply res ipsa loquitur in a malpractice case, it has

definitely disapproved the same. In Kernodle v. Elder, 23 Okl. 743, 102 P. 138, 140, there was cited with full approval certain language employed in Ewing v. Goode, C.C., 78 F. 442, as follows:

"'Before the plaintiff can recover, she must show by affirmative evidence: First, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, established neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, "Res ipsa loquitur," were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon, causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the "ills that flesh is heir to."'"

The court further said, referring to the opinion in Ewing v. Goode, supra:

"And in the body of the opinion there is the following statement by the court: 'A preponderance of the evidence in cases of this character is sufficient to sustain a plaintiff's cause. No more should be required, and no more is required; but it should be certain on the part of the court and jury that they are acting from actual evidence before them, properly referable to the cause, and that the judgment, when against the physician, is based upon such evidence, and not upon bias, conjecture, or inference.'"

See, also, Cooper v. McMurry, 194 Okl. 241, 149 P.2d 330.

In Arkansas the doctrine of res ipsa loquitur has not been specifically applied in cases against physicians and surgeons for alleged malpractice, but has been applied in a suit for damages allegedly caused by burns in the operation of a X-ray machine. In Gray v. McLaughlin, 1944, 207 Ark. 191, 179 S.W.2d 686, the court, beginning on page 195 of 207 Ark., at page 688 of 179 S.W.2d, said:

"Furthermore, it is not denied that appellee did receive an electric shock strong enough to set fire to his clothing and to burn him in several places, and that he received this shock while he was on the operating table of appellant, and that the shock was caused in some manner by appellant's X-ray machine. This being true, it did not devolve upon appellee to show the exact cause of the injury. In the case of Kelly v. Yount [Kelly v. Yount, 338 Pa. 190, 12 A.2d 579], supra, the Supreme Court of Pennsylvania, in discussing the rule as to the burden of proof in a case of this kind, said: 'When the thing which causes the injury is shown to be under the management of defendants and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by defendants, that the accident arose from a want of care * * *.'

"We conclude that there was substantial evidence to support the finding of the jury that appellee's injury was caused by the negligent operation of the X-ray machine."

Also, the doctrine has been applied in Arkansas in numerous other cases. In Coca Cola Bottling Co. of Fort Smith v. Hicks, 1949, 215 Ark. 803, at page 807, 223 S.W.2d 762, at page 764, Dr. Robert A. Leflar, while an Associate Justice of the Supreme Court of Arkansas, in writing for the court said:

"In the words of Mr. Justice Holmes, res ipsa loquitur is 'merely a short way of saying that, so far as the court can see, the jury, from

their experience as men of the world, may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case.' Graham v. Badger, 164 Mass. 42, 41 N.E. 61. This is the kind of inference that jurors commonly are allowed to make from circumstantial evidence, the only difference being that, when res ipsa loquitur applies, the circumstantial evidence from which the inference is drawn is the fact of the injury itself, plus the few obvious facts which surround the injury but do not clearly explain how it happened. See (1940) 8 Univ. of Ark. Law School Bulletin 43. The scope of this permissible inference must be carefully limited to exclude cases where the circumstances of the injury do not tend substantially to prove that negligence in the defendant, and in nobody else, caused the plaintiff's injury. To make certain that the injury has not been caused by somebody else, through some intervening negligence, it is ordinarily required that the instrumentality causing injury have been in defendant's exclusive possession and control up to the time of the plaintiff's injury. That requirement appears to have been satisfied when the plaintiff shows, as in the instant case, that there was no opportunity for the content or character of the charged bottle to have been changed from the time it left defendant's hands until it exploded."

In an article appearing in the March 1958 issue of Minnesota Law Review, Vol. 42, No. 4, beginning at page 652, it is stated:

"It is possible that the doctrine of res ipsa loquitur should receive wider application in negligence actions based on injuries caused by blood transfusions. * * *

"Res ipsa loquitur may be particularly useful in the area of blood transfusion injuries since the injured patient is seldom in a position to discover the specific cause of the injury. As to the applicability of the doctrine, it would seem that the prerequisites for its use may be met in many cases arising out of a blood transfusion injury. By way of illustration, if a person with type A blood receives a transfusion of type B blood, a fairly strong argument may be made for the application of res ipsa loquitur. First, although expert medical testimony may be required, the plaintiff should be able to establish that type B blood is not normally given to a type A recipient in the absence of negligence. Secondly, if the action is against the hospital, it should be fairly easy to demonstrate that it was the negligence of some employee of the hospital which caused the injury. Even if the blood bank had mislabeled type B blood as type A, the error should have been caught in cross-matching tests. Again, if the donor's blood was properly labeled, the hospital's technician probably failed to make the routine A–B–O typing tests on the recipient's blood and failed to make proper or any cross-matching tests. Lastly, it should not be difficult to establish that the plaintiff was free from contributory negligence. In any blood transfusion case the recipient hardly has an opportunity to be negligent."

The defendant in its brief states:

"With respect to the question of whether or not the doctrine of res ipsa loquitur should be applied, the court's attention is directed to the opinion of the Oklahoma Supreme Court in the most recent case of Jines v. City of Norman, Okl., 351 P.2d 1048."

That case was a suit for damages on account of the death of a patient in a

municipally owned hospital, and negligence was alleged against the hospital in administering oxygen to the patient who was suffering from a heart ailment. The trial court sustained a demurrer to the evidence adduced by plaintiff, and on appeal the court said:

"In an action for wrongful death, the burden is upon the plaintiff to establish by competent evidence that a negligent or wrongful act was the proximate cause. Masonic Hospital Assn. [of Payne County] v. Taggert, 171 Okl. 563, 43 Pac.2d 142; Guthrie v. City of Henryetta, 177 Okl. 122, 57 Pac.2d 1165; Lowden v. Friddle, 189 Okl. 415, 117 Pac.2d 533.

"Where all of plaintiffs' evidence, together with all inferences and conclusions to be drawn therefrom is not sufficient to clearly show a causal connection between the alleged negligence of the defendant and the injury to the plaintiff, the trial court properly sustained a demurrer. Sheridan v. Deep Rock Pet. Co., 201 Okl. 312, 205 Pac.2d 276."

After reviewing the evidence, the court at page 1052 of 351 P.2d said:

"We therefrom conclude the trial court did not err in sustaining the demurrer of the defendant to plaintiff's actions in damages for the wrongful death and funeral expenses of the decedent *for the reason plaintiff did not establish by competent evidence a causal connection between the alleged acts of negligence of defendant and the injury to decedent or that the alleged acts were the proximate cause of his death.*" (Emphasis added.)

■ The question of the application of the doctrine of res ipsa loquitur was not discussed by the court, but there is no doubt that the doctrine is recognized and applied in Oklahoma in a proper case. Mohawk Drilling Company v. McCullough Tool Company, supra, and cases cited in the opinion and footnotes.

Regardless of whether the doctrine of res ipsa loquitur is applied in the instant case the ultimate question to be determined from a consideration of all the evidence is whether the injury sustained by Mrs. Redding was proximately caused by the negligent or wrongful act or omission of the employees of the defendant while acting within the scope of their office or employment, under circumstances where the United States, if a private person, would be liable to the plaintiff in accordance with the law of Oklahoma where the act or omission occurred.

It is admitted that everything that was done on November 3, the day Mrs. Redding entered the hospital, and the next day, November 4, when the operation was performed, was done by employees of the defendant acting within the scope of their employment. She was entitled as a patient to be treated with due and reasonable care, skill, diligence and ability, and if the employees of the defendant failed to exercise the same degree of care, skill, diligence, and ability as is usually exercised by persons acting in a similar capacity in the general area of the hospital, and if such failure to so act was the proximate cause of the injury sustained, the defendant is liable.

It must be borne in mind that Mrs. Redding had been a patient of Captain Platock, the operating surgeon, for several months. On March 11, 1959, he had caused her blood to be typed, and the records of the hospital show that her blood was Group O positive. It was admitted that the type of a person's blood does not change. It is also undisputed that the operating surgeon requested the laboratory technician to type her blood on November 3, 1959, immediately after she entered the hospital for the operation. The technician, Sp-4 Emmitt E. Brown, proceeded to type the blood and erroneously typed her blood as B positive. There is no dispute that the correct type of her blood was O positive. After typing the blood as Group B, Rh-positive, he cross-matched the patient's blood with the blood in three bottles from the blood bank refrigerator, numbered 241, 281 and 282, labeled Group B, Rh-positive, and concluded that the blood in bottles 241,

281 and 282 was compatible with the patient's blood. The bottles were retained in the refrigerator until the next morning, November 4, when they were delivered to the operating room where the surgeon used bottles 241 and 281 in transfusing Mrs. Redding with 1,000 cc's of B positive blood. Fortunately only 1,000 cc's were transfused.

When the hemolitic reaction set in, it was decided, even before a retyping of the blood had been made, that incompatible blood had been transfused, and bottle 282 was returned to the laboratory.

Pfc. John J. Laverty, the laboratory technician on duty at that time, was called, and he immediately determined by the use of the same procedure that had been followed by Sp-4 Brown that the patient's blood was O positive. Realizing the seriousness of the mistake that had occurred, the Chief of the Laboratory Section, Captain Rex D. Couch, was called, who in turn called Sp-4 Brown, and they verified the finding of Pfc. Laverty.

When this verification was made, Captain Platock, acting under the directions of Dr. Freyhof of Brooke General Hospital, transfused Mrs. Redding on November 5 with 1,000 cc's of Group O, Rh-positive, whole blood. This probably saved the life of Mrs. Redding, and she was transferred to Brooke the next morning, November 6.

Prior to and at the trial the defendant admitted that incompatible blood was transfused during the operation, but contended that its employees were not negligent in the typing and cross-matching of the blood, but the facts are that they were negligent in the typing and cross-matching of the blood on November 3, 1959. Of course, the plaintiffs were unable to prove the specific act or omission of negligence on the part of defendant's employees, but the facts and circumstances disclosed by the testimony are convincing that the employees of the defendant did know, or should have known by the exercise of ordinary care, skill and ability, that the blood in bottles 241

and 281 was incompatible with the patient's blood.

Some of the witnesses for the defendant undertook to say that they followed the usual procedure, but when the mistake was discovered, the same procedure on the same blood was followed and the mistake was apparent. It is a reasonable inference from the facts and circumstances that there was negligence in the typing and cross-matching of the blood on November 3 by Sp-4 Brown, and this negligence was the proximate cause of the injuries received by Mrs. Redding.

In this connection it should also be borne in mind that Sp-4 Emmitt E. Brown, prior to his entry in the Army on November 6, 1958, had only finished high school and attended a junior college for a period of one year. He was assigned to the hospital on January 3, 1959, for on-the-job training, and had been on-the-job training for eleven months when the mistake was made. On the other hand, Pfc. John J. Laverty had not only finished high school but had graduated from college with a chemistry major, and before being assigned as a laboratory technician had received training as a medic and laboratory technician in the Army School at Fort Sam Houston.

Under all the facts and circumstances disclosed by the testimony, the court is definitely convinced that the employees were negligent and that their negligence was a proximate cause of the injuries suffered and damages sustained by the plaintiffs. This being true, the next question for consideration is the measure of damages.

Dr. Leflar, in the 1938 edition of his treatise on the Arkansas Law of Conflicts of Law, in discussing the measure of damages in Sec. 85, p. 200, states:

"The size of a right is a part of the right. A cause of action for damages in the amount of a thousand dollars is a very different substantive thing from a cause of action for damages for a hundred dol-

lars. That means that measure of damages should be treated as a substantive rather than a procedural matter, and that the amount of the award in a tort action should be determined by the rules of law of the place where the tort occurred rather than by those of the forum."

In the 1959 edition of the Law of Conflicts of Law the same author in Sec. 65, p. 118, reaffirmed the statement above set forth. See, also, O'Neil v. United States, 1953, 92 U.S.App.D.C. 96, 202 F.2d 366.

■ Therefore the amount of the damages recoverable by the plaintiffs is governed by the law of the State of Oklahoma.

In determining the amount to be awarded, it must be remembered that neither of the plaintiffs expended any money for medical treatment.

The plaintiff, Silas Redding, Jr., in the complaint prayed for the recovery by him for the present and future mental anguish endured by him, as well as for the loss of services, companionship and consortium of his wife. Under the law of Arkansas a husband may recover for mental anguish suffered by him in the event of the death of his wife by the wrongful act of another. Ark.Stat. Ann., Act 255 (1957), Secs. 27–906 to 27–909 (Supp.1959). But where death does not result from the wrongful act, there can be no recovery for mental anguish absent any physical injury to the husband. In Belt v. St. Louis-S. F. Ry. Co., 10 Cir., 1952, 195 F.2d 241, at page 243, the court, speaking through Chief Judge Murrah, said:

"Oklahoma courts are committed to the rule that 'No recovery can be had for mental pain and anguish, which is not produced by, connected with, or the result of, some physical suffering or injury, to the person enduring the mental anguish.' St. Louis & San Francisco Ry. Co. v. Keiffer, 48 Okl. 434, 150 P. 1026. In other words, Oklahoma law does not compensate for mental anguish or disturbance alone—it must be a part of the physical suffering and inseparable therefrom, as where the mental anguish is superinduced by physical hunger pains. See Thompson v. Minnis, 201 Okl. 154, 202 P.2d 981."

■ Therefore, the court in awarding damages to the plaintiff, Silas Redding, Jr., cannot consider the mental anguish, if any, past, present or future, that has been, is, or will be endured by him, but he is entitled to be awarded a sum which, in the judgment of the court, after consideration of all the facts, would compensate him for loss of services, society and companionship of his wife, Georgia J. Redding. Aderhold v. Stewart, 172 Okl. 77, 46 P.2d 346.

In H. A. Marr Grocery Co. v. Jones, 203 Okl. 698, 226 P.2d 392, the court held that in arriving at the amount of damages that a plaintiff is entitled to recover for the loss of his wife's companionship, the jury or court is entitled to fix such amount from its observation, experience and knowledge applied to the circumstances of the case, because no monetary yardstick has been established for determining the value of such loss.

■ The plaintiff, Georgia J. Redding, is entitled to recover for (1) past, present and future physical pain and suffering; (2) the past, present and future mental anguish; (3) the disfigurement of her face and body; (4) the loss or reduction of physical ability to perform her regular household tasks; and (5) the permanent injury to her kidneys and the permanent rheumatoid arthritis produced by the impaired upper urinary tract.

■ The amount awarded to each of the plaintiffs should be such a sum as will reasonably compensate for all the damages proximately caused by the injuries. In determining the amount, the court should bear in mind that neither plaintiff is entitled to recover anything for the pain, suffering and mental anguish arising solely from the hysterectomy operation, but should consider only such injuries as arose and were proximately caused by the negligence of the employees of the defendant. The

court is not aware of any legal yardstick by which any of the damages recoverable by the plaintiffs can be accurately measured, but, broadly stated, the measure of damages should be such a sum so far as it is susceptible in estimate of money as will reasonably compensate a party for all losses for which the party is entitled to recover.

With these principles in mind, the court believes that the plaintiff, Silas Redding, Jr., should recover the sum of $10,000 for loss of the services, society and companionship of his wife.

The plaintiff, Georgia J. Redding, should recover the sum of $40,000 as damages for her injuries as hereinbefore set forth.

Therefore, a judgment should be entered in favor of the plaintiffs, awarding to the plaintiff, Silas Redding, Jr., the sum of $10,000 as his damages, and to the plaintiff, Georgia J. Redding, the sum of $40,000 as her damages.

The fee of plaintiffs' attorneys should also be fixed at 20 percent of the total amount recovered, to be paid out of, but not in addition to, the amount of the judgment in accordance with the provisions of 28 U.S.C. § 2678.