HEMBREE v. VON KELLER et al.

No. 29944. Oct. 7, 1941.

*119 P. 2d 74.*

Abernathy & Abernathy, of Shawnee, for plaintiffs in error.

Rittenhouse, Webster, Hanson & Rittenhouse, of Oklahoma City, and Champion, Champion & Fischl, of Ardmore, for defendants in error Frederick P. Von Keller and Von Keller Hospital.

GIBSON, J. This is an action for wrongful death against the driver of an automobile whose alleged negligence caused the injuries to plaintiff's intestate, joined with an action against a hospital and a physician whose alleged malpractice in treating said injuries resulted in the death of the intestate.

Verdict and judgment were for plaintiff against the automobile driver, and judgment was for the other defendants on a directed verdict. Plaintiff alone appeals.

In order to readily identify the parties, the plaintiff in error will be referred to as plaintiff, and the defendant physician as Dr. Von Keller, the hospital as Von Keller Hospital, and the car driver as Owen Hembree.

Plaintiff, according to his statement in his brief, presents all assignments of error under the one proposition that the trial court erred in sustaining the motions of Dr. Von Keller and Von Keller Hospital for directed verdict.

The deceased received the injuries in question in an automobile wreck which, according to the verdict, was the result of the negligence of Owen Hembree. The injuries were in the nature of severe cuts and bruises about the legs, and broken bones at the point of the cuts. Immediately after the accident the deceased was entered as a patient at the defendant hospital and placed under the care of Dr. Von Keller. She remained in the hospital five days and was then released to the plaintiff, her husband, who removed her by ambulance to a hospital at Maud and placed her under treatment of one Dr. J. P. Irby. On Dr. Irby's advice she was removed the same day, or the next, to St. Anthony's Hospital in Oklahoma City, and placed under the care of one

Dr. O'Donoghue. Four days later, or ten days after the accident, she died of tetanus infection.

Plaintiff's case against Dr. Von Keller and Von Keller Hospital is based on their alleged failure to administer tetanus antitoxin to the patient. He asserts that the administration of antitoxin in such case is recognized as proper practice, and failure to so administer is recognized as not proper practice. This, he says, was established by the testimony of expert witnesses. To prove that antitoxin was not administered, he relies on circumstantial evidence which he alleges established the following facts:

The patient developed tetanus and died as a result thereof in the average period in such case where antitoxin is not administered; if antitoxin is administered, tetanus is absolutely prevented in 95 per cent to 100 per cent of cases of similar injury; if tetanus does develop after antitoxin is administered, the period prior to the development of the disease is doubled or longer and the attack is much milder than where the antitoxin is not administered; the patient developed unmistakable symptoms of the disease two or three days prior to her death and numerous injections of antitoxin were administered after the symptoms appeared; that the witness Corrine Kantz testified that the hypodermic which Dr. Von Keller testified he called for and administered was a hypodermic of morphine and not anti-tetanus serum; that there was no showing on the patient's chart that anti-tetanus serum was administered; that such showing was necessary and proper; that there was no charge shown for the antitoxin in the statement presented to the plaintiff; that it is customary to make such charge, and customary that some memorandum thereof be given by the nurse to the bookkeeper so the latter might make the proper charge.

Plaintiff seeks first to apply the doctrine of res ipsa loquitur to this case. That is, plaintiff takes the position that the facts and circumstances surrounding the medical treatment of intestate were wholly within the knowledge of the defendants, and that the fact of death from tetanus speaks for itself and raises a presumption of negligence on the part of defendants, thus to establish a prima facie case and shift the burden of proof.

No persuasive authority is cited in support of this contention. The case of Maki v. Murray Hospital, 91 Mont. 251, 7 P. 2d 228, is considered by plaintiff as authority here. But that was not a malpractice case. A patient in the hospital, while delirious, fell or jumped from a window and received personal injuries. The court held that the hospital was required to use ordinary and reasonable care and diligence in the care and treatment of patients, and the fact that plaintiff while delirious had jumped from a window was sufficient to establish a prima facie case of negligence under the doctrine of res ipsa loquitur. No question of medical or surgical treatment was involved. The case is therefore not in point.

Though this court has not had the opportunity to apply res ipsa loquitur in a malpractice case, it has definitely disapproved the same. In Kernodle v. Elder, 23 Okla. 743, 102 P. 138, there was cited with full approval certain language employed in Ewing v. Goode, 78 Fed. (C. C.) 442, as follows:

"Before the plaintiff can recover, she must show by affirmative evidence: First, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, established neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon, causing the bad

result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

And in the body of the opinion there is the following statement by the court:

"A preponderance of the evidence in cases of this character is sufficient to sustain a plaintiff's cause. No more should be required, and no more is required; but it should be certain on the part of the court and jury that they are acting from actual evidence before them, properly referable to the cause, and that the judgment, when against the physician, is based upon such evidence, and not upon bias, conjecture, or inference."

In the absence of a specific contract to the contrary, a physician, as held in Muckleroy v. McHenry, 160 Okla. 139, 16 P. 2d 123, "is not responsible for damages for want of success, unless it is shown to be the result of want of ordinary skill and learning, such as ordinarily possessed by others of his profession, or for want of ordinary care and attention. He is not presumed to engage for extraordinary skill or for extraordinary diligence or care, nor can he be made responsible in damages for errors in judgment; or mere mistakes in matters of reasonable doubt or uncertainty." In this holding the court followed the rule expressed in Champion v. Kieth, 17 Okla. 204, 87 P. 845.

The burden of proof in cases of this character cannot be shifted to the defendant. The plaintiff must prove actionable negligence by a preponderance of the evidence. The rule is well expressed in Woodlawn Infirmary, Inc., v. Byers, 216 Ala. 210, 112 So. 831, as follows:

"Burden of proof in death action against doctor is not shifted from plaintiff by showing that unsuccessful result attended treatment; doctrine of res ipsa loquitur being inapplicable."

In 21 R.C.L. 407, it is said: "The burden of proof is not shifted by showing that an unsuccessful result has attended the treatment of the patient by the physician. Nor does the unsuccessful result of the case shift from the plaintiff to the defendant the burden of going forward." This statement is supported by many authorities there cited.

We gather from the authorities that negligence in a malpractice case should never be presumed from the mere fact of unsuccessful treatment of the patient. In order to shift the burden of proof, the plaintiff must first establish a prima facie case of actionable negligence.

We have considered the evidence in this case in the light of the rule suggested by plaintiff, and, as expressed in Stewart v. Bowser, 178 Okla. 382, 62 P. 2d 1195. It reads as follows:

"It is the duty of trial court when ruling on motion for directed verdict, at close of all evidence, to disregard all evidence unfavorable to the party against whom the verdict is sought, as well as incompetent evidence, and concede to be true all evidence supporting the view of the party against whom the motion is made. When this has been done, unless no recovery can be had on any view of plaintiff's evidence, the case should be left to the jury."

But we have also kept in mind the rule that the evidence, where purely circumstantial, must fall without the realm of mere conjecture and speculation and within the field of legitimate inferences from the established facts. Dixon v. Gaso Pump & Burner Mfg. Co., 183 Okla. 249, 80 P. 2d 678. There the rule is stated as follows:

"Negligence may be established by circumstantial evidence, and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts, at least a prima facie case is made. Burghardt v. Detroit United Railway, 206 Mich. 545, 173 N. W. 360, 5 A.L.R. 1334."

Plaintiff says that the medical profession considers the omission of antitetanus serum as improper practice in the treatment of injuries such as the intestate in this case received, and consequently the failure to administer said

serum was actionable negligence. Defendants introduced ample evidence to prove that the serum was administered in proper time, and plaintiff relies on the records in the hospital, the reaction of the patient, and the testimony of the witness Corrine Kantz, as aforesaid, as circumstantial evidence that the serum was not used.

Assuming, though we do not now decide, that the failure to use the antitoxin was improper practice, we look first to the evidence on the issue whether the same was actually administered.

Corrine Kantz, who owned or had worked in a drug store, testified that she saw a nurse at the defendant hospital prepare a hypodermic for the patient which was injected in the arm; that from her experience in the sale and preparation of hypodermics the one she saw prepared was one of morphine and not tetanus antitoxin. This was given to the patient about one and one-half hours after she entered the hospital. Witness saw no other hypodermic administered to the patient.

This witness's testimony is of no probative value. She did not attend the patient constantly after the patient's entry in the hospital. She was in no position to observe all that was done by the doctors and nurses; and she left the hospital at 7 o'clock a. m., or some three and one-half hours after the patient was admitted. There was other evidence that the doctor administered morphine. The mere fact that the witness saw the hypodermic prepared and given was no indication that antitetanus serum was not administered also. Witness was not present at all times and could not know what took place.

Considering now the testimony of medical witnesses concerning the patient's condition and her reactions as indicative of a lack of tetanus antitoxin, it was shown first that she died as a result of tetanus infection. Dr. Irby, plaintiff's witness, testified concerning the patient's condition when he examined her at Maud some seven days after the injury. She had a high fever, was nervous, had a severe headache, and suffered extreme pain about the injuries on her legs. He thought the symptoms indicated the beginning of lockjaw, or tetanus. The patient was immediately sent to Dr. O'Donoghue in Oklahoma City. Irby said also that antitetanus serum was generally considered as 100 per cent preventive; he had never heard of a case where antitetanus serum was administered in which the patient later developed tetanus. He had administered the antitoxin in two or three hundred cases; that the incubation period from the date of the injury to the date of the symptoms was six to ten days.

On cross-examination Dr. Irby said that the above statement concerning the period of incubation and percentage of cures was based wholly on his reading and hearing lectures on the subject. He had never treated a case of tetanus; he had never had a case under his care for treatment, but had administered the serum as a preventive as above stated.

Dr. O'Donoghue, by deposition, testifying for plaintiff, said that on arrival of the patient in Oklahoma City he administered a preventive dose of antitetanus serum. That next day she complained of stiffness in her neck and tightness around her jaws. This, he said, was the first thing that one could definitely say was positively of tetanic origin. More antitetanus serum was administered. The assumption would be that the tetanic infection occurred at the time of the injury; the incubation period would ordinarily be six to ten days; the greater number of cases fall within that period, but it could be shorter or much longer.

Certain textbooks were received in evidence and discussed by Dr. O'Donoghue. These authorities thought antitetanus serum to be a highly proficient preventive. One, a Dr. Cecil, said that of the wounded British soldiers during the World War who did not receive the antitoxin, 15 to 32 of each one thousand developed tetanus; after the injection of the antitoxin became routine, never more than two or three per thousand had the disease. Of the American

wounded only 4.16 per thousand developed tetanus after injection. Dr. O'Donoghue said he was not familiar with this authority or with the statement.

Statements from other books were read wherein the use of tetanus antitoxin was highly praised, but the witness said, while the books should be considered, one need not believe everything in them. This doctor also stated that the greater per cent of patients suffering from external wounds were not treated with the antitoxin, and it was therefore difficult to determine the percentage of efficiency of the serum; that if the cases that failed to develop tetanus without the injection of the antitoxin were eliminated, there would be a great difference in the percentage. It is shown that from 10 to 30 per cent develop the germ after administration of the serum in proper time. This latter fact we gather from the textbooks in evidence.

Dr. O'Donoghue also testified that antitetanus serum is efficient in the prevention or delay of tetanus, but is not an absolute preventive. He knew of two cases that had developed tetanus within the ordinary incubation period and died as a result thereof. He said further that the textbooks quoted were for reference and instruction, and that the statements therein were generalities and not to be accepted as absolute. He was of the opinion that the administration of antitetanus serum would ordinarily increase the incubation period, but this would not be true in every case.

Dr. G. S. Baxter was called as a witness for plaintiff. He testified that the serum was regarded as preventive, but whether as much as 100 per cent, he doubted it. He said the period of incubation was eight to ten days, to six weeks or three months; that the development of tetanus might be an indication that the serum was not given. But he qualified this statement by saying, with reference to the development of the germ, that "it would be regarded probably the antitoxin was not given, but I have testified that it wasn't 100

per cent preventive—could have had it and have had tetanus." In other words, the patient could have received the serum and yet develop tetanus.

Such was the medical testimony most favorable to plaintiff concerning the symptoms or indications that antitetanus serum was not administered by the defendants.

It is our opinion that the above evidence is not sufficient to remove the issue from the realm of conjecture and speculation. We find that among the cases where the antitoxin is duly administered, the patient may develop tetanus within from three days to several weeks. Judging from the evidence, the doctors and medical instructors are yet uncertain concerning the efficiency of the serum. It is highly efficient, and is recommended as a preventive, but it is not infallible. The condition of the patient and the nature of his wounds play a large part in the result. Some react favorably sooner than others. No one could say, without indulging in mere speculation and conjecture, that a particular case of tetanus would not have occurred had the serum been administered at the proper time.

Plaintiff says that the failure of the hospital record or chart of the patient to show that the antitoxin was administered, and the absence of a charge therefor made separately on the statement presented to plaintiff, constituted evidence that the serum was not administered.

Dr. O'Donoghue, testifying for plaintiff, said that in general, hospital nurses maintained records on patients in order to have permanent record of treatments and the progress of the patients while in the hospital. The record is made by the nurse in the case, and the head nurse is responsible for the record. Charts are supposed to contain a list of all medicines and treatments of every kind that are administered to the patient. If the patient should receive an injection of antitetanus serum, the hospital record should contain a reference thereto; that the failure to show such injection would be some evidence that none was given.

This witness further testified that errors often appeared in hospital records; that such errors often occurred in his own office; that such omissions occur sometimes when emergency treatment is being administered to a patient, and also when the doctor fails to notify the nurse of the treatment. He testified also that in doctors' offices and in clinics it was not unusual for the costs of treatment to be unitemized or unseparated.

Dr. Baxter, testifying for plaintiff, said that hospital records were supposed to be complete and show the administration of various drugs. On cross-examination he testified that the hospital record placed in evidence purported to be for the period from 3:30 a. m., when the patient was admitted, to 7 a. m. of the same day. It showed that the patient was taken to the X-ray room, where prints were made, and then carried to the operating room. Injection of morphine and atropine was made in the X-ray room, but there was no record of what transpired in the operating room. At 7:00 a. m. she was moved to a private room.

By this witness and the record it was shown that the chart was made up after 7 a. m. and not as the treatment progressed; that no record of any kind was made for the several hours the patient remained in the operating room.

The defendant Dr. Von Keller also testified that it was his custom in his own hospital to keep records of each of his patients, supposedly complete, showing every medicine administered both inside and outside the operating room.

But the above evidence does not establish sufficient facts upon which to base a reasonable inference that the antitetanus serum was not administered. The operating room was the proper place in which to administer the serum, yet there was absolutely no record of what transpired there throughout the entire period the patient was in that room. An account that does not purport to contain entries or record of a given transaction is not competent to affirm or to negative what actually took place. It is not sufficient to bring it within the rule expressed in Sharp v. Pawhuska Ice Co., 90 Okla. 211, 217 P. 214, to the effect that where book accounts or records are shown to be otherwise competent and the entries therein to be material, relevant, and evidentiary as to the issue, they are then equally competent for the purpose of proving either the negative or affirmative of such issue.

In the present case the records were not correctly kept. That is shown without contradiction. In fact, during the particular period material to this case, no record at all was made of what transpired. There was no book of account or record competent as evidence of what did or did not take place. The rule is stated in the last-cited case as follows:

"To render book accounts admissible in evidence, they must be shown to have been correctly kept, to have been kept in the ordinary course of business as an essential part of the system of business, to have been made at or reasonably near the time of the transaction, to be books of original entries, and shown to be relevant and material to the issue."

The court properly withdrew the case from the consideration of the jury, and did not err in directing a verdict for the defendants Von Keller and Von Keller Hospital.

The judgment is affirmed.

CORN, V. C. J., and OSBORN, BAYLESS, HURST, and DAVISON, JJ., concur. RILEY, J., dissents. WELCH, C. J., and ARNOLD, J., absent.