**ST. JOHN'S HOSPITAL & SCHOOL OF NURSING, INC., an Oklahoma Corporation, Plaintiff in Error,**

**v.**

**Ben D. CHAPMAN, Guardian over the Person and Estate of Rosie Belle Stand, Defendant in Error.**

**No. 41004.**

Supreme Court of Oklahoma.

May 23, 1967.

As Amended Sept. 12, 1967.

Rehearing Denied Sept. 12, 1967.

T. Austin Gavin, Hudson, Hudson, Wheaton, Kyle & Brett, Tulsa, for plaintiff in error.

Paul W. Brightmire, Tulsa, for defendant in error.

LAVENDER, Justice.

The action involved in this appeal was commenced by Ben D. Chapman as guardian of the person and estate of Rosie Bell Stand against St. John's Hospital and School of Nursing, Inc., an Oklahoma corporation. The action was for the recovery of damages claimed to have resulted from the breaking of the right femur (knee-to-hip bone) of said Rosie Bell Stand while she was a patient, and unconscious, in the defendant corporation's hospital in the City of Tulsa, Oklahoma. The incident was alleged to have occurred during the afternoon of November 30, 1961. The jury's verdict, and judgment of the trial court in accordance therewith, were for the plaintiff in the amount of $12,500.00. After its motion for a new trial had been overruled, the defendant perfected this appeal to this court. The plaintiff in error will be referred to herein as the defendant, and, for convenience, the plaintiff's ward will be referred to as the plaintiff.

Plaintiff's petition, as amended, pleaded certain specific acts of negligence on the part of the defendant and also specifically pleaded that the doctrine of res ipsa loquitur was applicable in the circumstances pleaded and that under that doctrine negligence on the part of the defendant would be presumed.

Defendant moved to strike the allegations concerning res ipsa loquitur and also demurred to the amended petition. Such motion and demurrer were overruled, and the defendant filed an unverified, general denial.

At the commencement of the trial, the parties stipulated, among other things, that "on the 30th day of November, 1961, at about four o'clock p. m., Mrs. Stand, the plaintiff's right femur was broken, and at the time it was broken that she was unconscious," and that the life expectancy of a white female person, sixty-seven years of age, is shown by the United States Life Tables, 1949 and '51, as fourteen years.

Plaintiff made no attempt to prove any specific act or acts of negligence on the part of the defendant or any of its employees but, insofar as establishing negligence is concerned, relied entirely upon the oral testimony of one witness and the presumption, or inference, of negligence which is said to arise under the doctrine of res ipsa loquitur in situations wherein that doctrine is applicable.

The one witness is the plaintiff's daughter, Juanita Lucille Thompson, who lived in Oregon. Insofar as bringing the situation within the rule of res ipsa loquitur is concerned, she testified that her brother called her in Oregon on November 25, 1961 and told her that their mother had had a stroke; that she came to Tulsa, arriving on November 28th, and went to St. John's Hospital; that the plaintiff was there and was unconscious and remained so for several days, including November 30th; that she stayed with the plaintiff at the hospital practically day and night; that the witness left the hospital around four o'clock in the afternoon of November 30th; that later her brother called her and told her that "they" had broken the plaintiff's leg while turning her in bed; that she came back to the hospital, arriving about six-thirty or seven o'clock; that she then talked with one of the hospital interns, a Dr. C., who told her he was sorry but there had been an accident, a nurse's aide had broken the plaintiff's leg while turning her in bed.

Defendant's argument under the first three of the four propositions presented in its briefs involves the dectrine of res ipsa loquitur. Its basic argument under those three propositions and presented under its first proposition is that the doctrine is not applicable to the situation presented by the plaintiff's witness. On this point, defendant contends (a) that the Latin phrase "res ipsa loquitur" literally means "the thing speaks for itself" or "the thing itself speaks"; that the "thing" itself must speak; that the "thing," sometimes referred to in the cases as the "instrumentality," must be an inanimate object; and (b) that the rule is well established in Oklahoma that the doctrine of res ipsa loquitur does *not apply in malpractice suits against physicians and surgeons* (citing Hembree v. Von Keller, 189 Okl. 439, 119 P.2d 74, and Cooper v. McMurry, 194 Okl. 241, 149 P.2d 330), so should not be applied in this type of case, particularly in view of the Oklahoma rule that what caused a personal injury is a question for medical science, and this plaintiff presented no such expert testimony.

As stated by the defendant in presenting the "inanimate object" portion of this argument, this court in the case of National Union Fire Insurance Co. v. Elliott, Okl., 298 P.2d 448, 451, quoted with approval from the Kansas case of Emigh et al. v. Andrews, 164 Kan. 732, 191 P.2d 901, 903, as follows:

"'* * * While there is conflict in the decisions relative to the application of that doctrine there is no dispute relative to the meaning of the words res ipsa loquitur. They simply mean "the thing speaks for itself." And that means the thing or instrumentality involved speaks for itself. It clearly does not mean the accident speaks for itself. It means that when *the initial fact*, namely what thing or instrumentality caused the accident has been shown then, and not before, an inference arises that the injury or damage

occurred by reason of the negligence of the party who had it under his exclusive control. The inference of negligence *arising from the initially established fact* compels the defendant, in order to relieve himself of liability, to move forward with his proof to rebut the inference of negligence. It therefore quite properly has been said the doctrine of res ipsa loquitur is a rule of evidence and not of substantive law. (Kansas citations.)'" (Emphasis supplied.)

And, as stated by the defendant herein, this court followed that statement from the Emigh case with the following statement of its own:

"The mere fact that an accident has occurred under mysterious or unexplained circumstances provides no basis for application of the doctrine which, as so often pointed out, is a rule of evidence only. Keefer v. Public Service Co. of Oklahoma, 185 Okl. 94, 90 P.2d 409; Cosden v. Wright, 202 Okl. 211, 211 P.2d 523. Lack of knowledge as to the cause of an accident alone cannot call the doctrine into play. We recognized this principle in Champlin Refining Co. v. George, 182 Okl. 118, 76 P.2d 895, wherein it was pointed out that the doctrine of res ipsa loquitur cannot be invoked until, as a preliminary proposition, a plaintiff established what thing caused the injury, and that the thing causing the injury was under the defendant's control. * * * "

Although not quoted by the defendant in its brief herein, the very next sentence in the same paragraph is:

"In the Emigh case, supra, the Kansas Court stated this principle in paragraph 4 of the syllabus, as follows:

"'An inference arises only from *an established foundation fact*. The inference cannot supply *the foundation fact* from which it arises.'" (Emphasis supplied.)

Later, in Furr v. McGrath et al., Okl., 340 P.2d 243, (wherein a wheeled jack that had been placed under one side of the plaintiff's

automobile on the driveway of the defendants' filling station became disengaged, rolled from under the automobile, struck the plaintiff who was standing on the driveway nearby and injured her, with the plaintiff being unable to tell how the jack became disengaged), this court, referring to the case of National Union Fire Insurance Co. v. Elliott, supra, which had been cited by the defendants in that case, said (page 248):

"* * * In refusing application of such doctrine to that case we cited the principle recognized in Champlin Refining Co. v. George, 182 Okl. 118, 76 P.2d 895, and applied in Emigh v. Andrews, 164 Kan. 732, 191 P.2d 901, and other cases, that:

"'* * * the doctrine of res ipsa loquitur cannot be invoked until, as a preliminary proposition, a plaintiff established what thing caused the injury, and that the thing causing the injury was under the defendant's control.' (298 P.2d 451.)" (Emphasis supplied.)

Continuing, this court said:

"We think the present case is more analogous to Travelers Ins. Co. v. Hulme, 168 Kan. 483, 213 P.2d 645, 649, 16 A.L.R.2d 793, in which the Emigh case was discussed and, in speaking of the subject doctrine, the *'thing' causing the injury was referred to as the 'initial' or 'foundation' fact*. There the foundation fact was said to be *defendant's use of the gasoline* while working on the automobile, and the court further said:

"'Having supplied the "foundation fact" or "initial fact" or "thing" which produced the injury, the application of the doctrine of res ipsa loquitur will then infer negligence on the part of defendant in the doing or commission of the act.'

"In the present case, there must be no confusion or misapprehension about the fact that (*according to plaintiff's evidence*) the cause of her injuries was *the jack's becoming disengaged* from under the car in such a manner as to roll to-

ward, and strike, her. * * *" (Emphasis supplied.)

It is to be noted that the Kansas court referred to the "thing" that produced the injury or damage as the "initial fact," or the "foundation fact," and that this court approved and, in effect, adopted such reference in both the National Union Fire Insurance Company case and in the Furr case.

In the syllabus to Lawton Coca-Cola Bottling Co. v. Shaughnessy, 202 Okl. 610, 216 P.2d 579, this court held:

> "Res ipsa loquitur is a rule of evidence whereby negligence of the alleged wrongdoer may be inferred from the mere fact that the accident happened, *provided the character of the accident and the circumstances attending it lead reasonably to the belief that, in the absence of negligence, it would not have occurred*, and the thing which caused the injury is shown to have been under the management and control of the alleged wrongdoer." (Emphasis supplied.)

In Sand Springs Park v. Schrader et al., 82 Okl. 244, 198 P. 983, 987, 22 A.L.R. 593, this court quoted with approval from Griffen v. Manice, 166 N.Y. 188, 59 N.E. 925, 52 L.R.A. 922, as follows:

> "When *the facts and circumstances from which the jury is asked to infer negligence* are those immediately attendant on the occurrence, we speak of it as a case of res ipsa loquitur; when not immediately connected with the occurrence, then it is an ordinary case of circumstantial evidence. In Benedick v. Potts, 88 Md. 52, 40 Atl. 1067 [41 L.R.A. 478] it is said: 'In no instance can the bare fact that an injury has happened, of itself and *divorced from all the surrounding circumstances,* justify the inference that the injury was caused by negligence. It is true that direct proof of negligence is not necessary. Like any other fact, negligence may be established by the proof of *circumstances* from which its existence may be inferred. * * * This phrase (res ipsa loquitur), which, literally translated, means that 'the thing speaks for

itself,' is merely a short way of saying that *the circumstances attendant upon an accident are themselves of such a character as to justify a jury in inferring negligence as the cause of that accident.*" (Emphasis supplied.)

Citing also Cohen v. Farmers' Loan and Trust Co., 70 Misc. 548, 551, 127 N.Y.S. 561, 564.

In Keefer v. Public Service Co. of Oklahoma, 185 Okl. 94, 90 P.2d 409, 411, it is said concerning the doctrine of res ipsa loquitur:

> "* * * Its effect is that when *the physical condition causing the injury* has been shown and is not explained by the defendant, an inference of negligence may be drawn as a legitimate deduction of fact * * *." (Emphasis supplied.)

We have examined more than twenty-five Oklahoma cases in which this court considered the doctrine of res ipsa loquitur, or some aspect or aspects thereof. It is true that in all but one of them (Hembree v. Von Keller et al., 189 Okl. 439, 119 P.2d 74, hereinafter discussed) an inanimate object was involved in causing the injury or damage complained of by the plaintiff. However, analysis of those cases (including Hembree v. Von Keller et al.) discloses that this court did not hold, or intend to hold, in any of them that when the doctrine of res ipsa loquitur is applicable, it is the inanimate object that speaks for itself. Such analysis discloses that it is a set of circumstances, a situation, that speaks for itself and says that negligence on the part of the defendant must have been involved because as a matter of common experience the injury or damage to the plaintiff would not have occurred in the ordinary course of things if the defendant had been exercising due care. It also discloses that the basic effect, and result, of the doctrine of res ipsa loquitur is to aid the plaintiff in a negligence action to make out a *prima facie* case of negligence on the part of the defendant in instances wherein, because of the peculiar circumstances, direct proof of why the accident happened (as distinguished from what caused the accident) is beyond the

power of the plaintiff but should be in the power of the defendant; and that it accomplishes this effect and purpose by authorizing the trier of the facts to make a legitimate deduction that the defendant had failed to exercise ordinary care in the circumstances.

■ In cases where an inanimate object is directly involved in causing the plaintiff's injury or damage, it is quite logical to require that the plaintiff show, as a preliminary proposition, that the defendant had the management and control of the object at the time the negligence, if any, on the part of the defendant would have occurred and that the plaintiff had no management or control over the object at any pertinent time and therefore could have had nothing to do with causing the injury or damage.

Res ipsa loquitur is a rule of justice. Smith v. Vanier, Okl., 307 P.2d 539. It is a rule of necessity, in that it proceeds upon the theory that in peculiar circumstances in which the rule is applicable it is within the power of the defendant to show that there was no negligence on his part, and direct proof of the defendant's negligence is beyond the power of the plaintiff. Carter Oil Co. v. Independent Torpedo Co., 107 Okl. 209, 232 P. 419; Cosden et al. v. Wright, 202 Okl. 211, 211 P.2d 523.

Defendant states that this court has held that the doctrine of res ipsa loquitur is not applicable in medical malpractice cases, citing Hembree v. Von Keller et al., supra, and Cooper v. McMurry, supra, and argues that this is a medical malpractice case, so the doctrine should not be applied in this case. In a related argument, the defendant also contends that this court has repeatedly held that where the question is one of science it must necessarily be determined by the testimony of skilled and professional persons, and from this the defendant argues that in this case the jurors were possessed of no scientific knowledge concerning pathological fractures of diseased bones and how they may occur, even without the negligence of any one, so that since the plaintiff in this case presented no medical experts on

those matters there could be no legitimate inference, under the doctrine of res ipsa loquitur if. it be held to be applicable in this case, that the plaintiff's broken leg was the result of negligence on the part of the defendant.

Concerning this last-mentioned argument, we deem it sufficient at this point to say that the question of whether or not a person's bone has been fractured is not, of necessity, a question for medical science, and in this case the defendant had stipulated that this plaintiff's right femur had been broken, and the plaintiff showed that it had been broken while plaintiff was being turned in her hospital bed by a nurse's aide; that the matters suggested by the defendant herein would be matters of defense to meet or overcome any inference of negligence that would arise under the doctrine of res ipsa loquitur if applicable and were so brought into the case by the defendant's own evidence and are not involved in a consideration of the question as to the applicability of the doctrine of res ipsa loquitur.

Both the Hembree case and the Cooper case, cited by defendant, involved unsuccessful, or undesirable, results attending treatment by a physician—an x-ray burn sustained by the patient in the Cooper case in the course of a fluoroscopic examination for diagnosis of a stomach disorder, and death of the patient in the Hembree case from tetanus which developed while the patient was being treated by the defendant physician for compound fractures of the legs. In the Cooper case, an inanimate object—a fluoroscope—was involved in causing the injury or damage. In the Hembree case, no inanimate object was involved. Such fact was not in any way involved in this court's holding in either case that the doctrine of res ipsa loquitur was not applicable. In both cases the court pointed out that under the law, in the absence of specific contract otherwise, a physician is not a warrantor of cures or results and is liable in damages only for want of skill and learning such as *ordinarily possessed by others in his profession practic-*

*ing in the general community*, or for failure to exercise the care and diligence *ordinarily exercised by others in his profession and practicing in the general community*. In the Hembree case, the court said:

"We .gather from the authorities that negligence in a malpractice case should never be presumed *from the mere fact of unsuccessful treatment of the patient*. In order to shift the burden of proof the plaintiff must first establish a prima facie case . of actionable negligence." (Emphasis supplied.)

Although not mentioned in either case, the plaintiff's evidence .was such that in each case the plaintiff had to rely upon an inference or presumption of negligence on the part of the defendant coupled with an inference or presumption as to what caused the injury or damage upon which the inference or presumption of negligence would be based. As held by this court in the second paragraph of its syllabus to National Union Fire Insurance Co. v. Elliott, supra, based upon the same statement in the Kansas case of Emigh v. Andrews, supra:

"An inference (of negligence· under the doctrine of res ipsa loquitur) arises only from an established foundation fact. The inference cannot supply the foundation fact from which it arises."

■ So, when viewed in the light of the facts involved, this court's statement in the syllabus to each of those cases that the doctrine of res ipsa loquitur is not applicable in malpractice actions against physicians was not a holding that physicians are exempt from or that malpractice cases are an exception to the doctrine of res ipsa loquitur.

■ Furthermore, under the doctrine of res ipsa loquitur the inference of negligence on the part of the defendant is allowed only where, in the circumstances presented by the plaintiff, the trier of the facts could logically infer that the defendant had failed to exercise ordinary care in the circumstances or, in the ordinary course of things,

the injury or damage would not have occurred; and in the Cooper case in order for the defendant to be liable under the rules of liability applicable to physicians in their treatment of patients, the negligence required was failure to exercise the care and diligence ordinarily exercised by others in the defendant's profession and practicing in the general locality—not just failure to exercise ordinary care.

■ That special standard of care does not apply to hospitals. There is an implied obligation or duty on the part of hospitals to exercise ordinary care and attention for their patients, and that care and attention should be in proportion to the physical and mental ailments and condition of the particular patient. Flower Hospital v. Hart, 178 Okl. 447, 62 P.2d 1248; Hillcrest Medical Center v. Wier, Okl., 373 P.2d 45.

Other jurisdictions have held the doctrine of res ipsa loquitur applicable to similar hospital situations. See Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228, and cases cited therein.

In Ybarra v. Spangard et al., 25 Cal.2d 486, 154 P.2d 687, 689, 162 A.L.R. 1258, (which was not a hospital case, but a medical malpractice case against a surgeon and an anesthetist) the Supreme Court of California, in holding the doctrine of res ipsa loquitur applicable in that case, said:

"* * * If the doctrine is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.' 9 Wigmore, Evidence, 3d Ed., § 2509, p. 382; see, also, Whetstine v. Moravec, 228 Iowa 352, 291 N.W. 425, 432; Ross v. Double Shoals Cotton Mills, 140 N.C. 115, 52 S.E. 121, 1 L.R.A.,N.S., 298; Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228, 231. In the last-named case, where an unconscious patient in a

hospital received injuries from a fall, the court declared that without the doctrine the maxim that for every wrong there is a remedy would be rendered nugatory, 'by denying one, patently entitled to damages, satisfaction merely because he is ignorant of facts peculiarly within the knowledge of the party who should, in all justice, pay them.'"

■ We perceive no good reason why the doctrine of res ipsa loquitur should not be applied to an otherwise proper situation merely because the plaintiff has not shown that some inanimate object was involved in causing the injury or damage complained of by the plaintiff in a negligence action. It would be extremely hard to conceive of a situation any more appropriate for the application of the doctrine than the situation presented by the plaintiff's evidence in the present case. She was admitted to the defendant's hospital suffering from a "stroke" and unconscious. She was still unconscious five days later when her leg was broken while she was being turned in her bed by a nurse's aide. She could not voluntarily have done anything to contribute to the breaking of her leg, and it was beyond her power to prove whether the action of the nurse's aide was culpable or innocent. The entire situation, even the plaintiff herself, was under the management and control of the defendant and its staff. Justice demands that the doctrine of res ipsa loquitur be applied in this case to aid this plaintiff in making out a prima face case of negligence on the part of this defendant by authorizing the trier of the facts to infer as a legitimate deduction from the fundamental facts shown by the plaintiff that the plaintiff's leg was broken as the result of negligence. We hold that the doctrine of res ipsa loquitur is applicable to the situation presented by the plaintiff in this case.

The defendant's first proposition is that the trial court erred in overruling the defendant's demurrer to plaintiff's evidence, since the doctrine of res ipsa loquitur does not apply and no effort was made by the plaintiff to prove the specific acts of negligence alleged in her amended petition.

■ Where a petition contains a general allegation of negligence as well as allegations of specific acts of negligence, the doctrine of res ipsa loquitur, if otherwise applicable, may be invoked where no proof is made as to specific acts of negligence. E. S. Billington Lumber Co. et al. v. Cheatham, 181 Okl. 402, 74 P.2d 120; Independent Eastern Torpedo Co. v. Gage, 206 Okl. 108, 240 P.2d 1119; Furr v. McGrath, supra. Plaintiff's allegation concerning the doctrine of res ipsa loquitur constituted a general allegation of negligence. As stated by the defendant, she made no attempt to prove any specific act of negligence. The defendant's first proposition cannot be sustained.

After the trial court had overruled the defendant's demurrer to the plaintiff's evidence, the defendant proceeded with its evidence designed to explain the accident and to show lack of negligence on the part of the defendant. At the close of all of the evidence, the defendant moved for a directed verdict in its favor. That motion was overruled.

■ In its second proposition, the defendant contends that the trial court erred in overruling its motion for a directed verdict. Under this proposition, the defendant points out that the plaintiff offered no evidence to rebut its evidence, and, even assuming that the doctrine of res ipsa loquitur is applicable, the defendant's evidence is so clear, convincing and overwhelming that reasonable minds would have to agree that the inference of negligence. if one existed, was "satisfactorily" overcome by the defendant's evidence and that the defendant was free from negligence in the premises. In support of this proposition, the defendant quotes a portion of this court's opinion in Keefer v. Public Service Co. of Oklahoma, supra. The pertinent portion of such quotation is as follows:

"* * * The rule of res ipsa loquitur is a rule of evidence only. (citing cases) Its effect is that when the physical con-

dition causing the injury has been shown and is not explained by the defendant, an inference of negligence may be drawn as a legitimate deduction of fact. (citing cases) The inference, however, is rebuttable and when a *satisfactory* explanation is offered by defendant, the inference is overcome. (citing cases)

"We are not unmindful of the rule announced in Billington Lumber Co. v. Cheatham, 1937, 181 Okl. 402, 74 P.2d 120, stating that ordinarily the weight of the rebuttal evidence offered by defendant to overcome the inference is for the jury. But if defendant's explanation is so clear and convincing that reasonable minds would agree that defendant was not negligent, the inference is overcome as a matter of law, and the court may properly instruct a verdict for defendant. Klein v. Price, 1936, 179 Okl. 272, 65 P.2d 198; Dunning v. Kentucky Utilities Co., 1937, 270 Ky. 44, 109 S.W. 2d 6; 45 C.J. 1224." (Emphasis supplied.)

We point out here that unless all reasonable men are bound to reach the same conclusion, it is the jury, in a jury trial, that is to determine whether or not the explanation offered by the defendant is "satisfactory" enough to overcome the inference of negligence, even though the defendant's evidence be undisputed. Furr v. McGrath, et al., supra.

The defendant's evidence consisted of the testimony of a licensed practical nurse and a nurse's aide who were stipulated to be employees of the defendant at the time involved in their testimony, five physicians who for varying periods of time had been specializing in orthopedics in the City of Tulsa, thirty x-ray films identified as films of the plaintiff's right leg taken at various times before and after plaintiff's injury on November 30, 1961, and the testimony of a physician who was the head of the x-ray department of the hospital and whose testimony was limited to identifying some of such x-ray films as having been taken in the hospital and being a part of the records of the hospital.

The testimony of the licensed practical nurse (L.P.N.) and nurse's aide, taken together, was in substance and effect that the orders were to turn the plaintiff in her bed every two hours; that between four and four-thirty o'clock of the afternoon of November 30, 1961, the two of them, acting together, turned the plaintiff in her bed from her right side to her left side; that one of them was on one side of the bed and the other one was on the other side of the bed; that they used a "draw sheet" in turning her; that the aide placed a pillow behind her back to help keep her in that position, on her left side, and was to hand another pillow to the L.P.N. to place between her knees as was customary; that just as the L.P.N. had raised the plaintiff's right leg some four to six inches, so that the pillow could be placed between her knees, with one hand above, and one hand below, the right knee, and being very careful in lifting the leg, there was a "snap" that might have been heard up to ten feet away; that a hospital intern was called immediately, and medical examination disclosed a fracture of the plaintiff's right femur.

Parenthetically, it is to be noted that, if it is not common knowledge, requiring no direct proof, that nurse's aides working in a hospital are employees of the hospital, the stipulation made after plaintiff rested her case, that the nurse's aide and L.P.N. who were in the process of turning the plaintiff in her bed when the right femur was broken on November 30, 1961, were employees of the hospital at that time, supplied such deficiency in plaintiff's case. Butler v. Civic Gas Co. et al., 199 Okl. 597, 188 P.2d 843.

One of the defendant's orthopedic specialists, Dr. R., testified that in 1952 he treated the plaintiff for a fractured right hip incurred in a fall and placed a pin in her hip (an x-ray film made by him at the time showed the fracture in the "neck" of

the femur, just below the ball of the ball-and-socket joint of the femur and pelvis).

Another one of the defendant's orthopedic specialists, Dr. S., testified that in May of 1956 plaintiff came to him with a draining sinus near her right hip, which was draining fluid of a purulent nature; that she was walking on crutches and could put no more than one-fourth of her weight on her right leg; that x-ray films made of her right hip area at that time disclosed the pin near the hip, and that the head, or ball, of the femur had rotted and dissolved into two large pieces and a number of smaller pieces, and that the neck of the femur had completely eroded away; that he operated and removed the pin but did not clean up the bone fragments at that time in order to allow the femur to build up resistance to osteomyelitis or infection of bone; that about a year later in 1957 he removed all remaining bone fragments, cleaned and scraped out the cavity and packed it to soak up the pus and to allow healing from the bottom out; that after she was released from the hospital she would come back on crutches to have the cavity re-packed, and the cavity gradually filled up; that she stopped coming back but he never did discharge her.

A third orthopedic specialist, Dr. W., testified for the defendant that in November of 1961 he was approached by one of the hospital interns about a patient in the hospital, the plaintiff, who had sustained a fracture of the femur; that he examined the plaintiff and the x-ray films that had been made after the fracture; that there was some rotation of her right knee; that, in his opinion, at that time, her right femur was quite demineralized, having lost considerable of its mineral or bone-salt content, and was quite weak, and because of a previously-existing infection (osteomyelitis) in the upper end of the femur any operation for fixation of the bone or installation of a pin was contra-indicated, regardless of her general physical condition; that he considered her general physical condition as "critical," especially at

her age, because of the cerebral vascular accident or "stroke" that she had suffered, the partial paralysis therefrom, staphylococcal pneumonia which had developed, and her being unconscious or in a coma; that he corrected the rotation of the knee and first placed her leg in skin-traction to maintain alignment of the bone, but the treatment changed from time to time until a plaster double-hip spica cast was applied shortly before she was discharged from the hospital; that she was under his care until she was discharged from the hospital; that an entry of December 29, 1961, on her hospital chart, made by one of the hospital interns, after consultation with the witness and at his direction but without specific instruction as to content, states: "X-rays reveal spiral fracture of middle third of femur with displacement laterally of proximal fragments. The patient and x-rays seen with (this witness) and Buck's traction with eight pounds will be applied for present. Plan in next day or two to place pin through tibial tubercle and use Thomas balanced traction as this is better. Do not feel that intramedullary pin could be used because of infection of right hip"; that a fracture which is not substantially straight across the bone is referred to sometimes as an oblique fracture and sometimes as a spiral fracture; that Dorland's Medical Dictionary (displayed to him by plaintiff's counsel) defines a "spiral fracture" as "one in which the bone is twisted apart," but, as he understands it, a fracture is described by the way it looks, and a spiral, or oblique, fracture can occur without any twisting of the bone, so that such definition would not be entirely correct; that laboratory reports on material draining from her leg, near the hip, indicated that it was from staphylococcal infection; and that, in his opinion, such infection had spread through the femur and the demineralization of the bone (sometimes referred to as "osteoporosis") at the site of the fracture, indicated by the x-ray films made at the time, was the result of atrophy of disuse superimposed on atrophy of disease.

A fourth orthopedic specialist, Dr. B., testified for the defendant that he saw the plaintiff several times between February of 1962 and the spring of 1963, the first time in St. John's Hospital and later in the convalescent facility of Mercy Hospital and in the Whitenack Nursing Home; that the first time he saw her she was in a double-hip spica cast, which he removed; that he did not make any x-ray films at that time because the St. John's films were available to him; that from his examination of those films he concluded at that time that the plaintiff had had a fracture of the distal (most distant from the body) third of her femur as a result of diseased condition of the bone, and that there had been a "clinical" union of the fracture.

The fifth orthopedic specialist used by the defendant, Dr. M., testified only as an expert in his field. In addition to testifying concerning their treatment of the plaintiff, as outlined above, the other four orthopedic specialists also testified as experts in their field. As such experts, all five were not asked all of the same questions, but insofar as the hypothetical questions (some of which involved examination of some x-ray films) or other questions concerning matters in their special field of medicine were the same, their answers were not inconsistent.

Some one or more of these experts made one or more of the following statements, in substance: Osteomyelitis is infection of bone. Osteomyelitis may spread from its original situs throughout the involved bone and even into other bones, but in older people tends to remain localized. Osteoporosis, or demineralization of bone, is a "softening" of the bone, in which the bone marrow and, as it progresses, the bone cortex, or outer layer which contains the bone marrow, are dissolved or eroded away when the rate of destruction of their cells exceeds the rate of construction of new cells. Such imbalance is brought on by a number of things, including disuse, osteomyelitis, or a combination of osteomyelitis and disuse, and some other things not claimed to be involved in this instance. Osteoporosis is not disclosed by x-rays until thirty or forty percent of the bone has been eroded away. Osteoporosis can and does progress to such extent that the remaining cortex becomes "brittle" and "paper-thin," and then is referred to as an "egg-shell" type of bone. An osteoporotic bone, especially one which has progressed to the "egg-shell" stage, is subject to "pathological fracture," which requires very little stress but always requires some stress and has happened to patients turning themselves in bed, or just walking, or even standing on an osteoporotic leg bone. For some reason, not understood, a pathological fracture will heal about the same as a fracture from trauma heals.

Also some one or more of these experts expressed one or more of the following *opinions:* There was osteomyelitis in the upper portion of the plaintiff's right femur as early as 1956. Her physical condition at the time she entered the defendant's hospital in November of 1961 was such that it was required that she be turned in her bed about every two hours to prevent bed sores and other bad results from lying in one position without movement. Even the x-ray films of the area of the fracture in question, made on the day it occurred, indicated that demineralization of the femur in that area was about as much as the bone would tolerate and had progressed to the extent that the bone was of the "egg-shell" type in the area of the fracture involved therein. The fracture was an oblique fracture and was a pathological one. It appeared to heal normally and, just before the application of the plaster double-hip spica cast, appeared to have healed to such extent that application of such a cast was indicated, in place of the traction then being used, so that she could be turned in bed. There was lateral displacement at the union at that time. In view of all of the circumstances, the fracture was not incompatible with the careful handling of

the plaintiff while turning her in her bed as described by the licensed practical nurse and nurse's aide in their testimony and was not incompatible with careless handling of the plaintiff at that time.

Apparently anticipating some of the defendant's evidence, the plaintiff's daughter had testified during the plaintiff's case in chief that on the mornings of November 29th and 30th, at the request of a nurse's aide, she had assisted the nurse's aide in bathing and turning the plaintiff; that they used a rolled-up blanket at her back to keep her on her side; that she never saw a pillow used for that purpose and never saw a pillow between the plaintiff's knees; and that she never knew of more than one "nurse" being in the room at any time her mother was turned in bed before the incident in question.

■ The defendant's evidence alone, as well as the evidence as a whole, was sufficient to establish the fundamental facts from which a legitimate deduction of negligence on the part of the defendant in the handling of the plaintiff at the time she sustained the fracture in question could, under the doctrine of res ipsa loquitur, be made, but—even without considering the defendant's evidence concerning the "egg-shell" condition of the plaintiff's right femur at the time the fracture occurred, and how easily such a bone may be fractured, even without any negligence on the part of anyone—such evidence concerning negligence was conflicting in that the testimony of the licensed practical nurse and nurse's aide about how carefully they were handling the plaintiff at the time the fracture occurred, was sufficient, if believed, to sustain a finding of non-negligence. While the defendant's evidence concerning the "egg-shell" condition of the plaintiff's right femur at the time the fracture occurred was not controverted, its evidence concerning negligence or non-negligence in the fracturing of the plaintiff's right femur, assuming it to have been in that condition at the time, was not so clear and convincing that reasonable minds would have to agree that the defendant was not negligent. Submitting to the jury the issue of negligence on the part of the defendant was not error on the part of the trial court. The defendant's second proposition cannot be sustained. Keefer v. Public Service Co. of Oklahoma, supra; Klein et al. v. Price, 179 Okl. 272, 65 P.2d 198; J. C. Penny Co. v. Forrest, 183 Okl. 106, 80 P.2d 640; Butler v. Civic Gas Co. et al., 199 Okl. 597, 188 P.2d 843; North American Accident Insurance Co. v. Ralls, Executor, Okl., 288 P.2d 1097; Fairmont Creamery Co. et al. v. Rogers, 189 Okl. 320, 116 P.2d 983.

The defendant's third proposition is that the trial court erred in giving Instruction No. 7:

"You are instructed that plaintiff relies on the doctrine of res ipsa loquitur. This is a special doctrine of the law which may be applied only under special circumstances, they being as follows:

"First: The fact that some certain instrumentality, by which injury to the plaintiff was proximately caused, was in the possession and under the exclusive control of the defendant at the time the cause of injury was set in motion, it appearing on the face of the event that the injury was caused by some act or omission incident to defendant's management.

"Second: The fact that the accident was one of such nature as does not happen in the ordinary course of things, if those who have control of the instrumentality use ordinary care.

"Third: The fact that the circumstances surrounding the causing of the accident were such that the plaintiff is not in a position to know what specific conduct was the cause, whereas the one in charge of the instrumentality may reasonably be expected to know, and be able to explain the precise cause of the accident.

"When all these conditions are found to have existed, the inference of negli-

gence to which they give birth will support verdict for the plaintiff, in the absence of a showing by defendant that offsets the inference.

"And in this connection, you are instructed that it is the theory of the defendant that the bone in the plaintiff's leg was weakened by disease, and that the attending nurse and nurse's aid used reasonable care in handling the patient. Therefore, if you find that the plaintiff's leg was weakened by disease and that the defendant's agents used ordinary and reasonable care in caring for the plaintiff, then you must return a verdict for the defendant. *In the absence of such finding, your verdict must be for the plaintiff.*" (Emphasis supplied.)

The defendant does not attack any portion of the instruction other than the last sentence thereof: "In the absence of such a finding, your verdict must be for the plaintiff." The defendant contends that this sentence made the inference or presumption of negligence under the doctrine of res ipsa loquitur a conclusive one, by relieving the plaintiff of the burden of proving negligence and placing upon the defendant the burden of proving lack of negligence in order to prevail.

 This would appear to be true if such last sentence be considered by itself or only in connection with the paragraph of which it is a part. However, we note that the trial court, in Instruction No. 2, instructed the jury that "the burden of proof in this case is upon the plaintiff to establish the material allegations contained in the petition (which were outlined in the court's statement of the pleadings, preceding Instruction No. 1, with a statement that the allegations therein made do not constitute any part of the proof of the facts alleged and are not to be considered as evidence) by a preponderance of the evidence before you will be authorized to return a verdict for the plaintiff in this case"; and, in Instruction No. 6, told the jury, in part, that "before one found guilty of negligence may be held to respond in damages therefor, it must be shown by a preponderance of the evidence that said negligence was the proximate cause of the injury and damages, if any, sustained." Without approving Instruction No. 7 as given in this case as a model to be followed in cases in which the doctrine of res ipsa loquitur is applicable, we believe that said instruction, when considered as a whole, and especially when considered with the other instructions given by the trial court, did not relieve the plaintiff of the burden of proving negligence or make it necessary for the defendant to establish its defense in order to prevail. When so considered, Instruction No. 7 submitted to the jury the question as to whether or not the facts sustained the res ipsa loquitur inference of negligence relied upon by the plaintiff, and, if they did sustain such inference of negligence, whether or not the defendant satisfactorily overcame such inference by its evidence concerning the condition of the plaintiff's leg and the care used by the defendant's employees in handling the plaintiff at the time in question. This was proper. J. C. Penny Co. v. Forrest, supra. Where the instructions, when considered as a whole, correctly state the law and fairly submitted the issues to the jury, the case will not be reversed for technical error in the instructions, especially where the jury was not misled. Calhoun et al. v. Fisher, 202 Okl. 542, 215 P.2d 846. From a consideration of all of the evidence and the instructions as a whole, it does not appear probable that the jury was misled by the one sentence complained of by the defendant herein. See Rosier v. Metropolitan Life Insurance Co., 197 Okl. 35, 168 P.2d 302. The defendant's third proposition cannot be sustained.

Under its fourth and last proposition, the defendant contends that the judgment for the plaintiff must be reversed because it is based upon a verdict which is excessive in amount because, being a general verdict in a lump-sum without various amounts being awarded for various items of damages, it necessarily reflects the trial

court's Instruction Nos. 9 and 11, which authorized the jury, in the event it found for the plaintiff, to consider the factors of permanent injury or disability and future pain and suffering in arriving at the amount of the verdict, and which instructions were erroneously given because there was no expert medical evidence of permanent injury or disability or of future pain and suffering. The defendant properly preserved such alleged error. Forrest E. Gilmore Co. v. Hurry, 165 Okl. 29, 24 P.2d 653.

■■■ In Shawnee-Tecumseh Traction Co. v. Griggs, 50 Okl. 566, 151 P. 230, 231, wherein it was contended that the trial court erred in submitting the matter of future pain and suffering to the jury, this court said:

. "There are two rules by which the question of future pain and suffering may be submitted to the jury: If the injury is objective, and it is plainly apparent, *from the very nature of the injury,* that the injured person must of necessity undergo pain and suffering in the future, then most certainly the plaintiff would not be required to prove a fact so plainly evident, and upon making proof of such an objective injury the jury may infer pain and suffering in the future. (Citations here.) Where the injury is subjective, and *of such a nature* that laymen cannot, with reasonable certainty, know whether or not there will be future pain and suffering, then, in order to warrant an instruction on that point, and to authorize a jury to return a verdict for future pain and suffering, there must be offered evidence by expert witnesses, learned in human anatomy, who can testify, either from a personal examination or knowledge of the history of the case, or from a hypothetical question based on the facts, that the plaintiff, with reasonable certainty, may be expected to experience future pain and suffering, as a result of the injury proven. (Citations here.)"

The same requirement is made as to the character and nature of proof of permanent injury or disability as is made with reference to future pain and suffering. Jones v. Sechtem, 131 Okl. 155, 268 P. 201, 203.

■■■ X-ray films of the fracture area of the plaintiff's right femur, taken from the side and from the front, on January 19, 1962, shortly before the application of the plaster double-hip spica cast, and on February 3, 1962, after the application of such cast, were among the x-ray films introduced into evidence by the defendant and explained by the defendant's medical experts. Some one or more of the defendant's medical experts testified that the films made on January 19, 1962, showed considerable healing of the fracture and that the healing had progressed to the point where application of the double-hip spica cast was indicated; and that, while the side view showed good alignment of the two portions of the bone at the union, the front views, particularly the one taken on January 19, 1962, showed lateral displacement at the union. In this last-mentioned film, the displacement so referred to by the medical expert or experts is clearly visible and clearly shows a jagged, oblique fracture with a side-wise displacement of at least one-half of the width of the bone for at least three inches lengthwise of the bone. It is common knowledge that the principal purpose of placing a plaster cast on a fractured leg-bone or arm-bone is to maintain the portions of the bone in the same alignment that they are in when the cast is applied. In this instance, the union or healing of the fracture (knitting" of the bone, in layman's language) was well along, according to the defendant's medical experts, when the cast was applied. It is plainly apparent, from the very nature of the plaintiff's injury as it existed on January 19, 1962, and February 3, 1962, as disclosed by the x-ray films made on those dates and explained by medical experts, that there is a misalignment of the two portions of the plaintiff's right femur; that such misalignment will

be permanent; that at that time there was of necessity some physical impairment or disability because of such injury, and of necessity such physical impairment or disability is permanent in nature.

It is quite clear, from the very nature of the fractured femur sustained by this plaintiff, as disclosed by x-ray films made shortly after the fracture and explained by the medical experts, that the plaintiff must, of necessity, have had some physical pain and suffering and mental anguish at the time of the fracture and for some time thereafter, although the orthopedic specialist who took care of plaintiff after the fracture was sustained testified that in his opinion the pain and suffering at the time the fracture occurred was "minimal" because plaintiff was unconscious or in a coma at that time. With this and the demonstrated permanent nature of the injury, disability and physical impairment in mind, we think that, insofar as future physical pain and suffering and mental anguish are concerned, the situation is comparable to the situation in Edwards v. Chandler, Okl., 308 P.2d 295, after the medical evidence had been given and after the plaintiff in that case had displayed to the jury the prominences on his arm caused by the end of a metal pin that had been inserted at the site of the fracture sustained by him as a part of the treatment of the fractured arm. In that case, in approving the trial court's submission to the jury of the question of future pain and suffering, this court said at page 299:

"* * * The jurors had a good opportunity of seeing for themselves (objectively) what Dr. S described as the 'prominence of the pin at the elbow' of plaintiff's arm, and of drawing certain conclusions concerning the likelihood of his suffering pain in moving his arm when the plaintiff appeared before them and made the demonstration indicated in the record * * *."

Likewise, we believe that in the present case the nature of the plaintiff's injury was demonstrated by competent evidence to be such that the plaintiff must, of necessity, undergo some physical pain and suffering or mental anguish, or both, in the future.

The verdict of $12,500.00 is amply supported by the evidence and does not show to have been the result of bias, passion or prejudice.

Under the evidence, it was not error for the trial court to authorize the jury, in Instructions Nos. 9 and 11, to consider future pain and suffering and mental anguish, and future physical impairment, if any, in arriving at the amount of its verdict in the event it should find for the plaintiff. Therefore, such instructions did not result in an excessive verdict. The defendant's fourth proposition cannot be sustained.

Judgment affirmed.

JACKSON, C. J., and DAVISON, WILLIAMS, BERRY, HODGES and McINERNEY, JJ., concur.

BLACKBIRD, J., concurs in part and dissents in part.